**BARRICK GOLD EXPLORATION, INC., et al., Plaintiffs,**

v.

**Marty D. HUDSON, et al., Defendants.**

No. C2–93–0104.

United States District Court,
S.D. Ohio, E.D.

June 16, 1993.

Alvin J. McKenna, Poerter, Wright, Morris & Arthur, Columbus, OH, (Peter Buscemi and Anthony C. Roth, Morgan, Lewis & Bockius, Washington, DC, of counsel), and Paul A. Green and John R. Mooney, Beins, Alexrod, Osborne, Mooney & Green, P.C., Washington, DC, for trustees.

James Rattan, Asst. U.S. Atty., Columbus, OH, and Brian G. Kennedy and Kathleen E. Moriarty, U.S. Dept. of Justice, Civ. Div., Washington, DC, for intervenor U.S.

## MEMORANDUM OPINION AND ORDER

GRAHAM, District Judge.

Plaintiffs Barrick Gold Exploration, Inc. ("Barrick"), Gateway Coal Company, ("Gateway"), Maxus Energy Corporation ("Maxus"), and Creighton Hills Coal Co. Inc. ("Creighton") challenge the constitutionality of the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. No. 102–486, § 9701 *et seq.*, 106 Stat. 2776, 3036–3056 ("the Act"), codified at 26 U.S.C. § 9701 *et seq.*, which was passed on October 24, 1992 as part of the Energy Policy Act of 1992. Barrick, Gateway and Creighton have ceased their coal mining operations but are subject to liability under the Act. Maxus is liable under the Act by virtue of Gateway's status as its subsidiary. Defendants are the trustees of two employee welfare benefit plans established pursuant to the Act. These plans are the intended recipients of payments plaintiffs are required to make under the Act. Plaintiffs request a declaratory judgment to the effect that the Act is unconstitutional as applied to them, and ask the Court to preliminarily and permanently enjoin the defendants from enforcing the Act against them.

Subsequent to the filing of the complaint, the United States of America sought leave to intervene pursuant to 28 U.S.C. § 2403. Leave to intervene was granted on March 26, 1993. The Court conducted an oral hearing on plaintiffs' motion for a preliminary injunction on March 26, 1993. On April 21, 1993, the Court issued an order in which it proposed to consolidate the hearing on the motion for a preliminary injunction with the trial on the merits, and offered the parties the opportunity to present additional evidence. Supplemental stipulations were filed on May 11, 1993. No other evidence being offered, the Court will view the record as complete.

Since at least 1950, the National Bituminous Coal Wage Agreements ("NBCWAs") between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association, Inc. ("BCOA"), a multiemployer association of coal producers, have contained provisions for health care benefits for active and retired coal miners. Coal producers who were not members of the BCOA, like the present plaintiffs, have bound themselves to identical terms by signing so-called "me too" agreements. All producers who were parties to such agreements were required to make contributions to one or more UMWA trust funds in order to fund the pension and health benefits promised to the miners under the agreements. From 1950 to 1974, health and pension benefits were provided through a single fund. In 1974, in response to the Employee Retirement Income Security Act of 1974 ("ERISA"), the fund was divided into four separate trusts, two for pensions and two for health benefits. The two health benefit trusts were the United Mine Workers of America 1950 Benefit Plan ("1950 Plan") and the United Mine Workers of America 1974 Benefit Plan ("1974 Plan"). The 1950 Plan provided coverage for miners who retired before December 6, 1974 or who retired between December 6, 1974 and January 1, 1976 and elected to be covered by the 1950 Plan. The 1974 Plan provided coverage for miners who retired after January 1, 1976 or who retired between December 6, 1974 and January 1, 1976 and elected to be covered by the 1974 Plan.

During the decade of the 1970's, a combination of demographic and economic factors

adversely impacted the UMWA health benefit plans. These factors included a significant reduction in the amount of coal produced under the NBCWA's, the retirement of a whole generation of miners and the rapid escalation of the cost of medical care. These problems led to the restructuring of the 1974 Plan in 1978. Under the 1978 NBCWA, each employer was given the responsibility for providing health benefits under the 1974 Plan for its own post–1974 retirees through individual employer plans established and financed by the employer. Each signatory was also obligated to make contributions to the 1974 Plan to finance benefits for post–1974 retirees whose last employer had gone out of business. The 1950 Plan continued to provide coverage for miners who retired prior to the implementation of the 1974 Plan. All signatory operators agreed to continue to fund both the 1950 and 1974 Plans and to establish individual plans as required by the 1978 agreement. The structure of the 1978 NBCWA was maintained, with minor changes, in all subsequent NBCWA's, including the 1988 NBCWA.

In the 1980's, the problems which plagued the Plans became more severe. As each successive NBCWA expired, numerous employers left the coal business. Some employers successfully contended in the courts that their obligation to provide health benefits ceased with the expiration of the last NBCWA they signed, and that the 1974 Plan became responsible for their retirees' medical benefits. *See e.g., In Re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992); *District 29, United Mine Workers v. Royal Coal Co.*, 768 F.2d 588 (4th Cir.1985); *United Mine Workers Int'l Union v. Nobel*, 720 F.Supp. 1169 (W.D.Pa.1989) *aff'd without op.*, 902 F.2d 1558 (3rd Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991). The responsibility for an increasing number of "orphan" retirees fell on a dwindling number of NBCWA operators. Meanwhile the cost of health care continued to escalate. By the late 1980's, these problems resulted in the inability of the 1950 and 1974 Plans to continue to provide health care benefits to UMWA retirees. This precipitated labor disputes and unrest in the nation's coal fields.

When collective bargaining failed to resolve an eleven month strike by the UMWA against the Pittston Coal Company, the Secretary of Labor intervened and facilitated a settlement which included provisions for the creation of the Secretary's Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Commission") which was authorized to analyze the retiree health care crisis. The Commission submitted its findings and recommendations to the Secretary in November, 1990. *See* "Coal Commission Report: a Report to the Secretary of Labor and the American People" (Nov.1990), Ex. A to Defendants' Memorandum Contra Plaintiffs' Motion For Preliminary Injunction, Doc. 11 (hereinafter "Report"). The Commission concluded that delivering and financing health care in the coal industry would require

> the imposition of a statutory obligation to contribute on current and past signatories, mechanisms to prevent future dumping of retiree health care obligations, authority to utilize excess pension assets and the implementation of state-of-the-art managed care and cost containment techniques.

Report at 60. Following the Report, Congress undertook its own study of the subject, and after two years of deliberations passed the Act. In so doing, Congress found:

> (1) the production, transportation, and use of coal substantially affects interstate and foreign commerce and the national public interest; and

> (2) in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

Act, § 19142(a)(1), (2), 106 Stat. at 3037. Congress further stated that the policy of the Act is:

> (1) to remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemploy-

er benefit plans that provide health care benefits to retirees in the coal industry; (2) to allow for sufficient operating assets for such plans; and

(3) to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans.

Act, § 19142(b)(1)–(3), 106 Stat. at 3037.

The Act implements three methods of providing health care benefits to retirees beginning February 1, 1993. First, the Act provides for the merger of the 1950 Plan and the 1974 Plan into a fund known as the UMWA Combined Benefit Fund (the "Combined Fund"). 29 U.S.C. § 9702. The class of beneficiaries entitled to receive benefits from this fund is limited to retirees who, as of July 20, 1992, were actually receiving benefits from the 1950 Plan or the 1974 Plan. 26 U.S.C. § 9703(f).

All 1988 agreement operators are required to make contributions to the Combined Fund during the first eight months, commencing February 1, 1993, in an amount sufficient to pay benefits and administrative costs incurred by the Combined Fund during those eight months. 26 U.S.C. § 9704(i)(1)(A). The amount of this contribution is reduced by the transfer of seventy million dollars from the 1950 Pension Plan pursuant to 26 U.S.C. § 9705(a). All 1988 agreement operators are also obligated to make contributions to the Combined Fund from February 1, 1993 to September 30, 1994 in an amount sufficient to pay expenses of the 1950 Plan and the 1974 Plan which had accrued and remained unpaid by February 1, 1993, reduced by the assets of the Plans as of that date. 26 U.S.C. § 9704(i)(1)(B). An additional obligation to pay annual premiums to the Combined Fund is imposed upon "assigned operators," that is, those operators who are assigned beneficiaries by the Secretary of HHS based upon the employment history of the retiree in relation to that operator pursuant to 26 U.S.C. § 9706.

The second provision for benefits is found in 26 U.S.C. § 9711. Under that section, last signatory operators who are required under the 1979 or a subsequent NBCWA to provide benefits under an individual employer plan must now continue to provide such coverage to certain retirees. A "last signatory operator" is the signatory operator which is the most recent coal industry employer of a retiree. 26 U.S.C. § 9701(c)(4). The class of eligible beneficiaries included within the scope of § 9711 are: 1) retirees who, as of February 1, 1993, are receiving health benefits under the terms of an individual employer plan; and 2) individuals who have met the age and service requirements for eligibility for benefits under an individual plan as of February 1, 1993 and who retire on or before September 30, 1994. 26 U.S.C. § 9711(a), (b).

Third, the Act establishes a new plan known as the 1992 UMWA Benefit Plan (the "1992 Plan"). The eligible beneficiaries under the 1992 Plan are: 1) those persons who, based on age and service as of February 1, 1993, would otherwise have been eligible for benefits from the 1950 Plan or the 1974 Plan were it not for the merger and July 20, 1992 cut-off date implemented by the Act; and 2) any person with respect to whom coverage under an individual employer plan is required pursuant to § 9711 but is not provided by a last signatory employer or a related person. 26 U.S.C. § 9712(b)(2). The class of beneficiaries is further limited to individuals who retire on or before September 30, 1994. Id. The Act requires that all 1988 last signatory operators pay an annual prefunding premium to the 1992 Plan based upon the number of beneficiaries or potential beneficiaries attributable to the operator. 26 U.S.C. § 9712(d)(1)(A). All 1988 last signatory operators are required to provide security in an amount equal to a portion of the projected future cost of providing benefits to beneficiaries or potentially eligible beneficiaries attributable to the operator. Finally, any last signatory operator is obligated to pay a monthly per beneficiary premium if a beneficiary attributable to it is currently receiving benefits from the 1992 Plan.

The Act does not address the provision of benefits to individuals who meet age and service requirements after February 1, 1993 or who retire after September 30, 1994. The treatment of noncovered employees is left to

future NBCWA's or congressional action. 26 U.S.C. § 9711(e).

Barrick, Gateway and Creighton operated mines under the 1988 and prior NBCWAs. Under the terms of those agreements, they contributed to the 1950 and 1974 Plans, even though they had no retired employees who were then entitled to receive benefits from those Plans. They also maintained individual employer plans which provided health care benefits to their active employees and any post–1974 retirees. Barrick, Gateway and Creighton have now permanently ceased covered operations and are not signatories to the current NBCWA. They expected that their obligation to provide health benefits for their retirees would end on February 1, 1993, when the 1988 NBCWA expired, and that their retirees would then be covered under the 1974 Plan. Each has paid or expects to pay contractual withdrawal liability payments to the 1950 and 1974 Plans as withdrawing employers pursuant to the terms of the 1988 NBCWA.

Plaintiffs claim that the Act, as applied to them, violates the Due Process Clause of the Fifth Amendment and the Taking Clause of the Fifth Amendment.

The standards for judging plaintiffs' due process claims are well settled. The Supreme Court stated in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976):

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. See, *e.g., Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). 428 U.S., at 15, 96 S.Ct. at 2892.

■ Congress has wide latitude in making choices regarding economic legislation, and courts have reviewed economic legislation with great deference to the legislature's policies. *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93

(1963). Legislation takes property without due process of law only if it is arbitrary, discriminatory or demonstrably irrelevant to the policy the legislature is free to adopt. *Nebbia v. New York,* 291 U.S. 502, 539, 54 S.Ct. 505, 516–17, 78 L.Ed. 940 (1934). The statute will stand if a rational relationship exists between it and a legitimate governmental objective. *Id.* at 537, 54 S.Ct. at 516; *Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013, 1021 (1st Cir.1989) (legislation is reviewed to determine whether, in light of all the relevant surrounding circumstances, any reasonably conceivable set of facts could establish a rational relationship between the legislative act and the government's legitimate ends).

■ Legislation which has some retroactive effect does not for that reason alone violate the Due Process Clause. As the Court noted in *Usery,* 428 U.S. at 16, 96 S.Ct. at 2893:

> [O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. See *Fleming v. Rhodes,* 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947); *Carpenter v. Wabash R. Co.,* 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940); *Norman v. Baltimore & Ohio R. Co.,* 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935); *Home Bldg. & Loan Assn. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); *Louisville & Nashville R. Co. v. Mottley,* 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911). This is true even though the effect of the legislation is to impose a new duty or liability based on past acts. See *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); *Welch v. Henry,* 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938); *Funkhouser v. Preston Co.,* 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243 (1933).

The Supreme Court later commented in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984):

> [T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the

retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.

Plaintiffs claim that the Act is arbitrary and irrational as applied to them for the following reasons: (1) they are required to contribute to the Combined Fund, even though no beneficiaries of that Fund were employed by them; (2) they are denied a refund of their contributions to the Combined Fund; and (3) they are required to continue individual plan benefits for their own retirees notwithstanding the fact that their contractual liability to do so ended upon the expiration of the 1988 NBCWA and they made substantial payments to the 1950 Plan and the 1974 Plan for contractual withdrawal liability. The Court will examine each claim under the standards enunciated above.

Plaintiffs first argue that the contributions to the Combined Fund required under 26 U.S.C. § 9704(i)(1)(A) and (B) constitutes an irrational liability as to them because they have no employees who are beneficiaries or potential beneficiaries of the Combined Fund. Although plaintiffs have no employees who are beneficiaries of the Combined Fund, they agreed, as signatories to the 1988 NBCWA and previous NBCWA's, to make contributions to the 1950 and 1974 Plans, even though they had no employees who were receiving benefits from those Plans. Plaintiffs participated in and benefitted from a contractual system which promised benefits to the beneficiaries of the 1950 and 1974 Plans, which under the Act have been merged into the Combined Fund. Plaintiffs voluntarily participated in this system, which for decades had promised retired coal miners and their dependents lifetime health care benefits. *See* Report at 1; *District 29, United Mine Workers v. United Mine Workers 1974 Benefit Plan & Trust,* 826 F.2d 280, 283 (4th Cir.1987), *Nobel,* 720 F.Supp. at 1178. In order to obtain the benefit of union labor under the NBCWA's, plaintiffs undertook responsibilities not only for their own retirees but for others.

Under 26 U.S.C. § 9704(i)(1)(A), plaintiffs are required to make contributions to the Combined Fund to cover benefits and administrative costs incurred by the Combined Fund during the first eight months. This payment is analogous to the withdrawal liability imposed by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub.L. 96–364, 94 Stat. 1208, which required an employer who withdraws from a multiemployer pension plan to pay a share of the plan's unfunded vested benefits. The Supreme Court upheld the constitutionality of the MPPAA, holding that the withdrawal liability provisions did not violate the Due Process Clause. *Pension Benefit Guaranty Corp.,* 467 U.S. at 728–734, 104 S.Ct. at 2717–20.

The Supreme Court recently addressed the MPPAA in *Concrete Pipe of California v. Laborers Pension Trust,* — U.S. —, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). The Supreme Court held that the withdrawal liability imposed by the MPPAA did not violate due process as applied to an employer who had no employees who were vested in the pension plan at the time of the employer's withdrawal. The Court noted that due to the nature of multiemployer plans, an employer's contributions are never used solely for the benefits of its own employees, and that an employer often agrees to participate in a multiemployer plan in the hope that this will cost the employer less in the long run than it would to create a single-employer plan, while at the same time accepting the risk that none of its employees will vest prior to the employer's withdrawal from the plan. *Id.* — U.S. at — — —, 113 S.Ct. at 2288.

In *Spring Branch Mining Co. v. UMWA 1950 Pension Trust & 1950 Pension Plan,* 691 F.Supp. 973 (S.D.W.Va.1987), *aff'd,* 854 F.2d 37 (4th Cir.1988), the court addressed the argument that the withdrawal liability imposed by the MPPAA violated the due process rights of operators who had no employees who were beneficiaries of the 1950 Pension Plan. The court noted the fact that the 1950 Pension Plan was funded through the contributions of all signatory operators, and that many of the beneficiaries were never employed by the companies bearing the

funding burden. *Id.* at 986. The court concluded that in light of the nature of the 1950 Pension Plan, its history of instability, and the fact that the companies were obligated under the collective bargaining agreement to contribute to that plan,. the MPPAA was a rational means to insure full funding of vested benefits and to discourage withdrawals by contributors, and was not irrational as applied to the plaintiff operators. *Id.* at 986–987.

A similar situation exists in regard to plaintiffs here. Plaintiffs were obligated under the NBCWA to contribute to the 1950 and 1974 Plans even though they have no employees who are beneficiaries or potential beneficiaries under those Plans. Thus, plaintiffs do have some prior connection to the payment of benefits to participants in the predecessors of the Combined Fund. The first-year cost provision is a rational means of assuring the adequate funding of benefits under the Combined Fund. This obligation extends only to the first eight months of the operation of the Combined Fund, and the burden imposed by this provision was reduced by the transfer of seventy million dollars from the 1950 Pension Trust. This provision is not irrational as applied to plaintiffs.

■ The same must be said of the contributions required under 26 U.S.C. § 9704(i)(1)(B). That section requires 1988 signatory operators to make payments for a period of twenty months to the Combined Fund to cover the unpaid liabilities of the 1950 and 1974 Plans which accrued prior to February 1, 1993. Plaintiffs were signatories to the 1988 NBCWA, which expired on February 1, 1993. Plaintiffs were contractually obligated to make payments to the 1950 and 1974 Plan during that period. The effect of § 9704(i)(1)(B) is to hold the 1988 operators liable for the deficits in those Plans which accrued prior to the expiration of the 1988 NBCWA and which were not adequately satisfied by the contributions made by the operators. It is rational and reasonable for Congress to hold the 1988 operators, including plaintiffs, responsible for these inadequately funded obligations which stem from a period when plaintiffs were signatories to the NBCWA and were contractually obligated to contribute toward these obligations.

■ Plaintiffs next argue that the Act violates their due process rights by failing to provide them with a refund of the first year cost contributions required under § 9704(i)(1)(A), while assigned operators receive a credit for those contributions. The court will assume for purposes of this argument that plaintiffs will not be assigned beneficiaries under 26 U.S.C. § 9706. Under 26 U.S.C. § 9704(a), operators who are assigned beneficiaries must pay annual per beneficiary premiums to the Combined Fund. The amount of the premium is calculated to produce sufficient funds to cover the payment of health benefits and administrative costs attributable to the operator's assigned beneficiaries. 26 U.S.C. § 9704(b). This premium must be paid for the plan year beginning February 1, 1993 (a period of eight months) and each successive plan year. *See* 26 U.S.C. §§ 9702(c), 9704(a). Under 26 U.S.C. § 9704(i)(1)(D)(i), the premium of an assigned operator under § 9704(a) for the plan year beginning on February 1, 1993 is reduced by the amount of the first year cost contribution paid by that operator under § 9704(i)(1)(A).

Congress realized that the process of assigning beneficiaries would take time, and wanted to insure that the Combined Fund was adequately funded during the period in which assigned operators were being identified. Congress chose to impose liability for the first eight months of the Fund's operations equally upon all 1988 signatories. The payment of the annual premium for the first year was postponed until October 1, 1993 to allow time for the assignment of beneficiaries. 26 U.S.C. § 9704(g)(1). This first year annual premium covers the same expenses which are covered by the first year costs contribution, and would represent a double payment for the same costs. Thus, Congress allowed a credit .toward the first annual premium for assigned operators to prevent this double liability. While operators who are assigned· a large number of beneficiaries might be responsible for a large annual premium and therefore ultimately pay more than other 1988 operators toward the first

year costs of the Combined Fund, no assigned operator will pay less than an unassigned operator, since an assigned operator is still liable for the full amount of the first year contribution under § 9704(i)(1)(A) even though that contribution may completely offset the additional liability for the first annual premium. Plaintiffs, as unassigned operators, are not liable for the first annual premium against which a credit for first-year cost payments is allowed. The failure to provide a refund of first year costs to plaintiffs does not result in them being held liable for more than assigned operators.

■ Plaintiffs argue that the Act's failure to grant them refunds of their contractual withdrawal liability payments is arbitrary and irrational. Plaintiffs indicate that they have paid or will pay withdrawal liability payments to the 1950 and 1974 Plans. They anticipated prior to the Act that their liability for providing health benefits would terminate upon the expiration of the 1988 NBCWA, at which point their employees would have been covered by the 1974 Plan.

The Act now requires them to some extent to continue to cover their employees under their individual plans and it provides no refund or credit for their contractual withdrawal liability payments. Specifically, the Act requires plaintiffs to continue individual plan coverage to employees who were receiving benefits under an individual plan as of February 1, 1993, or who have met the age and service requirements for benefits as of February 1, 1993, and have retired on or before September 30, 1994. The Act, as discussed above, also requires first year costs and deficit reduction contributions to the Combined Fund.

Plaintiffs contractually agreed to be bound by the withdrawal liability provisions when they signed the 1988 NBCWA. The purpose of the contractual withdrawal liability provision was to deter withdrawals and to make employers liable at least to some degree for damages caused by their withdrawal from the Plans. The contractual withdrawal liability imposed by the 1988 NBCWA represented only five years of contributions to the Plans, not the actual cost of funding lifetime health benefits for a withdrawing employer's retirees. *See* National Bituminous Coal Wage Agreement of 1988, Art. XX, Sec. (i)(3), Ex. B to Complaint. Indeed, a comparison of the cost of maintaining individual employer plans against the amount of the plaintiffs' withdrawal liability indicates that the withdrawal liability payments have no relation to the cost of providing lifetime retirement health benefits. *Id.* at 19.

Congress rationally found that the practice of operators withdrawing from the industry or otherwise terminating their obligation under the NBCWA, resulting in the transfer of their employees to the 1974 Plan, substantially contributed to the underfunding problems experienced by that Plan. These problems were not adequately addressed by the contractual withdrawal liability payments required under the NBCWA. To some extent, plaintiffs did receive the benefits of the contractual withdrawal provision and will continue to do so under the Act. Plaintiffs ceased making contributions to the 1950 and 1974 Plans when they ceased mining operations. Although the Act does require some contributions to the Combined Fund, it does so for a limited period. Plaintiffs are required to maintain individual plans for some employees, but not for employees who meet age and service requirements after February 1, 1993 or who retire after September 24, 1994. Congress did not act irrationally in preserving the withdrawal liability provision in the NBCWA or in failing to provide for a refund of withdrawal liability payments.

■ Plaintiffs argue in general that the Act violates due process principles because it results in an unreasonable allocation of responsibility and constitutes an arbitrary and irrational imposition of liability. Plaintiffs claim that the Act is retroactive and for that reason is subject to closer scrutiny under the Due Process Clause. The Act was passed on October 24, 1992 and became effective on February 1, 1993. The plaintiffs were signatories of the 1988 NBCWA which expired on February 1, 1993. The Act requires plaintiffs to continue to provide benefits which they were obligated to provide under the 1988 NBCWA and it requires them to make contributions to the successor to the 1950 and 1974 Plans to which they were required

to contribute to under the 1988 NBCWA. A statute such as the Act which essentially preserves or extends existing contractual obligations is not retroactive.

■ Even if the Act is considered retroactive, its retroactive effects are justified by a rational legislative purpose, to wit, to impose the cost of retirees' medical care on those who promised it. Insofar as retroactivity is concerned, this case is not markedly different from the congressional decision to impose liability on coal mine operators for the consequences of black lung disease. In upholding that legislation, the Supreme Court held:

> [T]he imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor.

*Usery,* 428 U.S. at 18, 96 S.Ct. at 2893. This Court can discern no rational difference between disabilities "bred in the past" arising from conditions of employment and legitimate expectations bred in the past arising from promises of employers. The Court notes that past promises of retirement benefits formed the rationale for the MPPAA, which passed constitutional muster· in both its prospective and retroactive applications. *See Pension Benefit Guaranty Corp.,* 467 U.S. at 728–734, 104 S.Ct. at 2717–20.

The Act is not irrational in terms of the liabilities imposed upon plaintiffs. While plaintiffs' view that they have no liability to fund health benefits after the expiration of the 1988 NBCWA has some support, a case recently decided by the District of Columbia Circuit Court of Appeals raises new issues concerning the existence of continuing liability. In *UNWA 1974 Pension v. Pittston Co.,* 984 F.2d 469 (D.C.Cir.1993), the court upheld the trial court's interpretation of the so-called "evergreen clause" included · in the trust agreements and incorporated by reference into the NBCWA. The clause was construed as imposing a perpetual obligation on the part of the operators to contribute to the 1950 Pension Plan even after the NBCWA has expired and the operator is no longer a signatory to the current NBCWA. *Id.* at 473–475. A similar "evergreen clause" is found in the 1950 Plan and in Article XII of

the 1974 Plan. It could be argued that plaintiffs would have been required under this clause to continue to contribute to the 1950 and 1974 Plans and to maintain their individual plans, as required under Article·XX, Sections (b) and (c) of the 1988 NBCWA, even after the expiration of the 1988 NBCWA. The Act itself does not preclude enforcement of these "evergreen clauses" as they relate to claims in existence as of February 1, 1993. *See* 26 U.S.C.· § 9708.

■ Even disregarding any possibility of continuing contractual liability, the Act as applied to plaintiffs does not violate due process. Plaintiffs were signatories to a series of collective bargaining agreements which promised lifetime health benefits· to miners. The limited contributions for first year costs are a rational means of. assuring the smooth transformation of the 1950 and 1974 Plans into the Combined Fund. This obligation was tempered by the transfer of funds from the 1950 Pension Plan. It is also rational to require plaintiffs to make contributions to meet the unpaid deficits of the 1950 and 1974 plans, to which they were required to ·contribute· under the 1988 NBCWA; those deficits having accrued prior to the expiration of the collective bargaining agreement.

■ Congress further acted rationally in assigning to plaintiffs the responsibility for funding benefits for their own employees under their individual plans. Plaintiffs were obligated under the 1988 NBCWA to provide individual plan benefits to their own employees. Under § 9711, plaintiffs are obligated to provide individual plan benefits only to those beneficiaries to which plaintiffs stand in the relationship of last signatory employer. Thus, this is not a situation where plaintiffs are required to provide benefits for nonemployees. This obligation· was substantially tempered by limiting this responsibility to cases involving employees who had already retired and were receiving benefits as of the expiration of the 1988 NBCWA, or who had met the age and service requirements as of that time and retired within twenty months thereafter.

■ Under § 9712, plaintiffs are required to pay annual prefunding premiums to the

1992 Plan based upon the number of beneficiaries or potential beneficiaries which are attributable to them as last signatory operators. Plaintiffs are also required to post security toward the payment of benefits for potentially eligible beneficiaries. Any last employer of a beneficiary who is actually receiving benefits under the 1992 Plan is further obligated to pay monthly per beneficiary premiums.

The provisions concerning the 1992 Plan are perhaps the most troublesome in terms of a due process analysis. Where an operator does not actually have any employee-beneficiaries who are receiving benefits under the 1992 Plan, its payments to the 1992 Plan are in the nature of an insurance premium against the possibility that the operator will later go out of business and cease to provide benefits to its employees. Where an operator fully complies with its obligation to provide coverage to beneficiaries under its individual plan, so that it never has any employees who become beneficiaries under the 1992 Plan, then the annual premium paid by that operator is used exclusively to fund benefits for the employees of other operators. If, however, an operator and any related person go out of business and no entity remains to fund individual benefits, the eligible employees of that operator then receive benefits from the 1992 Plan. Unfortunately, it is impossible for the court to look into the future to see what, if any, value in the form of employee benefits any one operator will ultimately receive from these annual premiums.

Plaintiffs are also obligated to provide security in the form of a bond, letter of credit, or cash escrow, in an amount equal to "a portion" of the projected future cost to the 1992 Plan of providing benefits to the beneficiaries or potential beneficiaries to which plaintiffs stand in the relation of last signatory operator. Presumably, the percentage of this "portion" is a matter for the trustees of the 1992 Plan to decide. If, for example, an operator were required to post 99% of the projected cost of benefits as security, it would appear to result in the imposition of double liability to require that operator to pay an annual prefunding premium as well.

However, the amount which plaintiffs will be required to post as security is not in evidence.

The court notes that last signatory operators, including pre–1988 last signatory operators, are required to contribute monthly premiums to the 1992 Plan where employees attributable to them are receiving benefits under the Plan. However, in light of the fact that beneficiaries become eligible for benefits under the 1991 Plan because they would otherwise have received benefits under the 1974 Plan or because their employer is not meeting its obligation to provide benefits under an individual plan for whatever reason, such as bankruptcy or going out of business, the court would anticipate that the monthly premiums might be hard to collect, and that the bulk of the funding for the 1992 Plan will come from the annual prefunding premiums paid by operators who are still in business.

The court concludes that the 1992 Plan does not violate plaintiffs' due process rights. It was not irrational for Congress to require what in essence are insurance payments against the possibility of plaintiffs' going out of business in the future and relegating its employees to the 1992 Plan. The beneficiaries and potential beneficiaries of the Plan are plaintiffs' own employees and employees of other operators who, but for the Act, would have been entitled to receive benefits under the 1974 Plan, to which plaintiffs had a duty to contribute under the 1988 NBCWA. The class of eligible beneficiaries of the 1992 Plan includes only individuals who had met age and service requirements prior to the expiration of the 1988 NBCWA, and who retire prior to September 30, 1994. The annual prefunding payment is calculated based upon the number of beneficiaries and potential beneficiaries who were last employed by plaintiffs. Presumably the amount of these premiums will decrease as the number of potential beneficiaries is reduced by death or by the subsequent employment of the beneficiary by some other operator in the coal industry. Further, it is not unreasonable to require plaintiffs to provide some surety toward the satisfaction of their obligation to provide lifetime health benefits.

■ The Due Process Clause does not require that Congress legislate with exact precision in the economic realm. The requisites of due process are met when Congress devises a scheme that rationally spreads the cost of solving a problem among those responsible for creating it. The liabilities imposed upon plaintiffs are rationally related to plaintiffs' roles as employers and signatories of the 1988 NBCWA, and are reasonably structured to spread the cost of benefits. Whether a "broader cost spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Usery,* 428 U.S. at 19, 96 S.Ct. at 2894. The Act as applied to plaintiffs does not violate the Due Process Clause.

■ Plaintiffs also challenge the Act on the grounds that it appropriates their private property for public use without compensation in violation of the Taking Clause of the Fifth Amendment. The Supreme Court has adopted a case-by-case approach to claims advanced under the Taking Clause, and the Court has identified certain factors as being of particular significance in the analysis. These are:

1.  The economic impact of the regulation on the claimant;

2.  The extent to which the regulation has interfered with distinct investment backed expectations; and

3.  The character of the governmental action.

*Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

■ The Court addressed a Taking Clause argument in *Connolly v. Pension Benefit Guarantee Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), which involved a challenge to the MPPAA withdrawal liability provisions. The court noted that "it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Id.* at 223, 106 S.Ct. at 1025. The Court went on to note that legislation adjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations, even though the legislation in effect imposes a new liability based on past acts. *Id.* The Supreme Court again applied the three factors identified above in the MPPAA context in *Concrete Pipe,* —— U.S. —— – ——, 113 S.Ct. at 2287 and concluded that the MPPAA withdrawal liability did not constitute a taking in that case.

Under the benefit-funding provisions of the Act, the government does not take property for its own use, but rather "adjusts the benefits and burdens of economic life to promote the common good." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026. Thus, the character of these provisions suggests that the Act's provisions do not constitute a taking mandating government compensation. Plaintiffs note that under 26 U.S.C. § 9707, the Secretary of the Treasury may impose a penalty for the failure on the part of an assigned operator to pay the premiums to the Combined Fund under § 9707. Plaintiffs argue that this government involvement indicates a taking by the government. This penalty is in the nature of a tax. Under 26 U.S.C. § 9707(f), the penalty is to be treated in the same manner as the tax imposed under 26 U.S.C. § 4980B, which penalizes the failure of an employer to provide health insurance continuation coverage. The tax provisions in § 4980B have been viewed as one method of enforcing the substantive obligation to provide continuation coverage. *See Johnson v. Reserve Life Ins. Co.,* 765 F.Supp. 1478 (C.D.Calif.1991). Congress likewise sought to ensure compliance with the provisions of § 9704(a) by providing for a tax as a penalty for failure to pay premiums. However, the court concludes that this in itself is not sufficient to convert the other provisions of the Act, which require that premiums or contributions be paid by the operators to the various health benefit plans, into a taking by the government. The court further notes that since plaintiffs maintain that they will not be "assigned operators" so as to be liable for the payment of premiums under § 9704, the penalty provided by § 9707 would not apply to them and would never constitute a taking as to them.

Although the economic impact of the Act on the plaintiffs is no doubt significant, it is

not severe when viewed in the total context of plaintiffs' past involvement in the coal industry. The nonrefundable interim contributions plaintiffs are required to make to the Combined Fund are as follows: Barrick, $3,457.44; Gateway, $141,959.65; Creighton, $6,590.60. While none of the plaintiffs have employees who will receive benefits from the Combined Fund, as noted earlier each of these plaintiffs assumed a degree of responsibility to the beneficiaries of the Combined Fund when, over a period ranging between eight and ten years, they participated in guaranteeing lifetime retirement health benefits to all coal miners who provided labor under the NBCWAs. *Compare Spring Branch Mining Co.,* 691 F.Supp. at 982 (withdrawal liability under MPPAA did not violate the Taking Clause where operators contributed to the 1950 Pension Plan as required by the NBCWA even though they had no employees who were beneficiaries of the Plan). While they were operating, the contributions of Barrick and Gateway to the predecessors of the Combined Fund exceeded $5,000,000 each, whereas Creighton's contributions while operating under the 1988 NBCWA totalled almost $100,000. Although the plaintiffs are required to make an interim contribution to the Combined Fund, they are excused from further contributions to the Combined Fund even though a good case could be made for requiring them to pay a share of the liability for beneficiaries who cannot be assigned to a specific employer. Furthermore, under § 9704(i)(1)(A), the amount of this contribution is reduced by funds transferred from the 1950 UMWA Pension Plan. Under these circumstances, the Court cannot characterize the economic impact of the contributions to the Combined Fund as severe.

The Act requires each plaintiff to continue its individual employer plan for it own retirees who meet the age and service requirements by February 1, 1993 and who retire by September 30, 1994. As of the time of the hearing on the motion for preliminary injunction, the monthly cost of doing so for each plaintiff was as follows: Barrick, $63,835.38; Gateway, $117,616.00; and Creighton, $454.67. Plaintiffs argue that this obligation is unreasonable in light of their obligation to pay contractual withdrawal liability under the 1988 NBCWA. However, plaintiffs promised each of their employees that they would have lifetime retirement medical benefits and presumably the monthly premiums they are now paying for such coverage is the fair and reasonable cost of performing that promise. Plaintiffs hoped to be able to transfer their retirees into the 1974 Plan in return for the following withdrawal liability payments to the 1974 Plan: Barrick, $126,309.34; Gateway, $600,000.00; Creighton, $15,772.77. When those amounts are compared to the monthly cost of providing coverage for their employees, the total inadequacy of the withdrawal liability payments becomes apparent. Plaintiffs do retain the benefit of being excused from paying annual premiums to the Combined Fund, and they are not liable for individual plan benefits for employees who retire after September 30, 1994. The Court cannot say that the economic impact of the failure to refund or credit plaintiffs' withdrawal liability is, in the total context, severe.

Under § 9712(d)(1)(A), the plaintiffs are required to pay an annual prefunding premium to the 1992 Plan in the following amounts: Barrick, $4,756.00; Gateway, $29,520.00; and Creighton, $82.00. Presumably this represents the reasonable cost of a plan which will ensure benefits for all retirees, including plaintiffs' retirees, who are now covered under individual employer plans, if their employer defaults. The amount of the premium, which is based solely on the number of beneficiaries or potentially eligible beneficiaries attributable to plaintiffs, should decrease over time as the number of potentially eligible beneficiaries decreases. This is just another component of the cost of performing the promise of lifetime health benefits to retirees which plaintiffs made to their employees. Viewed in that context, the Court cannot say that the economic impact on the plaintiffs is severe.

■ The liabilities imposed by the Act cannot be said to be out of proportion to plaintiffs' experience with the benefit plans and the NBCWA. *Connolly,* 475 U.S. at 226, 106 S.Ct. at 1026–27. Further, the mere diminution in the value of property, however

serious, which results from the liability imposed by the Act is insufficient to demonstrate a taking. *See Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2291.

The Act clearly interferes with the plaintiffs' expectations regarding their obligation to pay for their retirees' health benefits. Although they had promised lifetime health benefits for their retirees, they expected to discharge that obligation by assigning them to the 1974 Plan after they ceased their coal mining operations. However, in light of the problems which had afflicted the UMWA health benefit trusts for two decades, the extensive and long-term government regulation of the coal industry, Congress's involvement in solving the crisis in funding retirement pensions when it enacted ERISA and the MPPAA and the fact that the Act was contemplated and discussed for two years prior to its passage, plaintiffs should have anticipated that Congress might enact legislation which would require them to shoulder all or part of the cost of fulfilling the promise of lifetime retirement health benefits for UMWA workers. Investment expectations which ignored this possibility would not be realistic and the Court concludes that the Act does not interfere with realistic investment backed expectations.

The Act does not violate the Taking Clause. Further, the Act as applied to plaintiffs does not violate the Due Process Clause. Plaintiffs' request for an injunction enjoining enforcement of the Act against them is denied. The clerk is directed to enter judgment for the defendants.

It is so ORDERED.