**BARRICK GOLD EXPLORATION, INCORPORATED; Gateway Coal Company; Maxus Energy Corporation; and Creighton Hills Coal Co., Inc., Plaintiffs–Appellants,**

v.

**Marty D. HUDSON, et al.,
Defendants–Appellees,**

**United States of America,
Intervenor–Appellee.**

No. 93–3783.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 29, 1994.

Decided Feb. 24, 1995.

David J. Laurent (argued and briefed), Thomas A. Smock (briefed), Polito & Smock, Pittsburgh, PA, and Gerald L. Draper (briefed), Thompson, Hine & Flory, Columbus, OH, for plaintiffs-appellants.

Douglas N. Letter (argued and briefed), Dept. of Justice, Appellate Staff, Civ. Div., Washington, DC, for intervenor.

Alvin James McKenna, Porter, Wright, Morris & Arthur, Columbus, OH, Peter Buscemi (argued and briefed), Morgan, Lewis & Bockius, Paul A. Green, and John R. Mooney, Beins, Axelrod, Osborne, Mooney & Green, Washington, DC, for defendants-appellees.

Dan D. Rhea (briefed) and Lewis R. Hagood (briefed), Arnett, Draper & Hagood, Knoxville, TN, for amicus curiae.

Before: KEITH, NELSON, and SUHRHEINRICH, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

We are presented in this appeal with a challenge to the constitutionality of the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. §§ 9701, *et seq.* (the "Coal Act"), as applied to the plaintiff companies.[1]

The plaintiffs conducted coal mining operations over a number of years, and they or their predecessors bound themselves to a series of collective bargaining agreements, known as National Bituminous Coal Wage Agreements ("NBCWAs"), with the United Mine Workers of America. These agreements, the last of which was negotiated in 1988, included provisions under which active and retired coal miners were to receive health care benefits.

During the period when the 1988 agreement was in force, each of the plaintiffs stopped conducting mining operations covered by the agreement. As a result the plaintiffs became obligated, under the terms of the agreement, to make "withdrawal" payments to two multi-employer benefit plan trust funds through which health benefits were provided to certain categories of retired UMW-represented coal miners.[2]

The Coal Act, which was signed into law prior to the expiration of the 1988 agreement, mandated the merger of the two multi-employer funds into a new Combined Fund as of February 1, 1993, the date on which the 1988 agreement was scheduled to expire. All signatories to the 1988 agreement, including the plaintiffs, were required by the Act to make payments covering a portion of the costs of the new fund during an eight month transition period. Coal mining companies with continuing operations were required to

1. Plaintiff Maxus Energy Corp., formerly known as Diamond Shamrock Corp., is "related" to plaintiff Gateway Coal Co. within the meaning of 26 U.S.C. § 9701(c)(2). Gateway, like each of the remaining plaintiffs, was a "signatory" coal mine operator within the meaning of 26 U.S.C. § 9701(c)(1). For purposes of this opinion we shall treat Maxus and Gateway as a single plaintiff.

2. The funds in question were known as the "1950 plan" and the "1974 plan." The former provid-

ed coverage mainly for UMW-represented miners who had retired before December 6, 1974. The latter provided coverage for other UMW-represented miners who did not have coverage under individual employer health benefit plans. The contractual withdrawal liability assessed against the plaintiff companies came to a total of $8,584,060. Most of this money went to the 1950 plan; the plaintiffs' total withdrawal liability payments to the 1974 plan came to approximately $845,800.

make annual premium payments to the new fund thereafter, and such companies could credit their "transition rule" payments against their annual premium obligations. No such credit was available to companies which, like the plaintiffs, had no annual premium obligations.

The 1978 NBCWA had imposed a general requirement that signatory companies establish and finance individual employer health benefit plans for their own post–1974 UMW retirees. The Coal Act required companies that maintained such plans, including the plaintiffs, to continue providing health benefits to their individual plan retirees indefinitely. Companies that had incurred contractual withdrawal liability to the 1950 and 1974 multi-employer plans were not authorized to offset or credit such liability against the cost of providing continued individual employer plan coverage. Neither was any provision made for refunds of contractual withdrawal liability payments.

The plaintiff companies sued the trustees of the Combined Fund [3] for declaratory and injunctive relief. In an opinion and order reported at 823 F.Supp. 1395 (S.D.Ohio 1993), the district court (Graham, J.) granted judgment to the defendant trustees.

■ The issues presented by the plaintiffs on appeal have been narrowed to these:

– Does the Coal Act violate the "substantive" component of the Due Process Clause [4] to the extent that it fails to grant the plaintiffs a refund, credit or offset for (a) their contractual withdrawal liability payments and (b) their transition rule payments?

– Does the Coal Act violate the Takings Clause in these respects?

Under current Supreme Court doctrine, we believe, both issues must be resolved against the plaintiff companies. The judgment of the district court will be affirmed.

## I

■ In passing the Coal Act, Congress removed the subject of health benefits for current UMW retirees from the collective bargaining process and dealt with it legislatively instead. The circumstances that led to this decision are described in the district court's opinion, as are the general structure and mechanics of the Coal Act itself. See 823 F.Supp. at 1398–1401. An understanding of these matters is important to a proper understanding of the case, but we shall not repeat here the exegesis ably presented in Judge Graham's opinion.

The plaintiff companies tell us that "the Coal Act imposes new and unprecedented obligations that could not reasonably have been imagined when the Companies became bound by the 1988 NBCWA...." Reply Brief, p. 3. From a dollars and cents standpoint, it appears, the obligation that has the biggest impact on the plaintiffs is the one imposed by 26 U.S.C. § 9711(a). This section provides, in substance, that "last signatory operators" who have been providing retiree health coverage under a collectively-bargained individual employer plan must continue to provide coverage thereunder regardless of any continuing contractual obligation.

The plaintiffs' estimated annual cost of providing such individual employer plan cov-

3. The trustees of another UMW benefit plan, known as the "1992 plan," were also sued, but the issues raised in connection with the 1992 plan have not been pressed on appeal.

4. Although the Due Process Clause might appear on its face to be concerned with matters of "process," and not with matters of substance, the Supreme Court has long held that the clause has a substantive component as well as a procedural one. See, e.g., Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); Railroad Retirement Bd. v. Alton Railroad Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Planned Parenthood of

Southeastern Pennsylvania v. Casey, —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Since the latter part of the 1930s the Supreme Court is widely thought to have been less than enthusiastic about invoking substantive due process to strike down economic legislation. See, e.g., West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). The concept of substantive due process clearly remains viable in the Court's thinking today, however—and under this concept courts may invalidate legislation that deprives persons of life, liberty or property on a basis found to be arbitrary and irrational.

erage comes to a total of $772,892.[5] Were it not for the Coal Act, the plaintiffs suggest, they could have terminated their individual plans when the 1988 agreement ended in February of 1993. Retirees enrolled in the individual employer plans at that time would have been "orphaned," in effect, and presumably could have received health benefits under the 1974 multi-employer plan for as long as that plan continued in existence and remained solvent.

Notwithstanding the magnitude, novelty and alleged unforeseeability of the new obligations imposed by the Coal Act, the plaintiffs do not directly contend that Congress acted unconstitutionally in imposing these obligations. The plaintiffs' contention, rather, is that when the new obligations were imposed, Congress was constitutionally required to provide for a refund, credit or offset in respect of any contractual withdrawal liability payments made to the multi-employer plans under the 1988 agreement, as well as providing for a refund, credit or offset in respect of transition rule payments made by companies that had gone out of the coal business.

Not to provide such refunds, credits or offsets, the plaintiffs argue, served no legitimate legislative purpose. It was irrational and arbitrary, they say, for Congress to give them no credit for payments of a sort that companies remaining in the business either did not have to make at all (the contractual withdrawal liability payments) or that such companies would be able to recoup down the road (the transition rule payments).

Fewer than three percent of the 933 employers that bound themselves to the 1988 agreement made contractual withdrawal liability payments to the multi-employer plans. But if the Coal Act had simply merged the plans into a new combined fund without more, the plaintiffs say, the 1988 agreement might arguably have been construed as requiring signatory companies to make withdrawal liability payments even if they had not gone out of the coal mining business. The Coal Act forestalled any argument along these lines by providing, at 26 U.S.C.

§ 9702(a)(2), that the merger of the multi-employer plans "shall not be treated as an employer withdrawal for purposes of any 1988 coal wage agreement." The plaintiffs maintain that it was irrational to deny them credit for their contractual withdrawal liability payments when most other coal mining companies had made no such payments and were assured, under the statute, that they would not have to do so by reason of the merger.

As to the transition rule payments through which the resources of the new Combined Fund were augmented during the fund's start-up period, the plaintiffs argue that Congress intended to impose Combined Fund liability only on employers with retirees who were Combined Fund beneficiaries. None of the plaintiffs' retirees was a Combined Fund beneficiary. Therefore, the plaintiffs submit, it was irrational for Congress to deny the plaintiffs an opportunity to recoup their transition rule payments after the fund was up and running, when employers that did have beneficiaries in the fund—and that thus were required to make ongoing annual premium payments—were entitled to have their transition rule payments credited against their annual premium obligations.

## II

In *Railroad Retirement Bd. v. Alton Railroad Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), the Supreme Court struck down as unconstitutional a federal statute, the 1934 Railroad Retirement Act, that established a pension system funded, in part, by compulsory contributions from carriers regulated by the Interstate Commerce Commission. Former employees—including some who had already retired—were included in the scheme if they had been in the service of a regulated railroad within one year prior to passage of the statute. The result, as the *Alton* Court observed, was that "[t]he statute would take from the railroads' future earnings amounts to be paid for services fully compensated when rendered in accordance with contract, with no thought on the part of either employ-

---

5. The plaintiffs' transition rule payments—which, under 26 U.S.C. § 9704(i)(1)(A), do not have to

be repeated annually—came to a total of $152,-007.

er or employee that further sums must be provided by the carrier." *Id.* at 349, 55 S.Ct. at 762.

The "former employee" provision and other challenged features of the statute were found to be non-severable, and the Court held that they rendered the act invalid under the Due Process Clause. *Id.* at 362, 55 S.Ct. ᴀᴠ 767 The Court went on to hold that the act was also bad because "it is not in purpose or effect a regulation of interstate commerce within the meaning of the Constitution." *Id.*[6]

If the case at bar had come before the *Alton* Court in 1935, the obligations imposed by the Coal Act might well have been held unconstitutional under the Due Process Clause regardless of the presence or absence of provisions authorizing refunds, credits or offsets. This is not 1935, however, and more recent caselaw strongly suggests that the obligations imposed by the Coal Act are not unconstitutional.

"It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

Applying this deferential standard, the *Turner Elkhorn* Court upheld the constitutionality of a statutory requirement that coal mine operators provide compensation for miners who had been disabled by black lung disease arising out of employment in mines for which the operators were responsible—and provide such compensation regardless of whether the miners had left employment in the coal industry before the statute was passed.

Legislation readjusting rights and burdens does not violate the Due Process Clause "solely because it upsets otherwise settled expectations," *Turner Elkhorn* teaches, and "[t]his is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Id.* at 16, 96 S.Ct. at 2892. It was not irrational for Congress to spread the burden as it did, the *Turner Elkhorn* Court went on to hold, because black lung disease had been "bred in the past" and the operators had profited in the past from the labor of those who became afflicted with the disease. *Id.* at 18, 96 S.Ct. at 2893. Judge Easterbrook has observed that in *Turner Elkhorn* the Supreme Court "said, as bluntly as a court ever does, that it was out of the business of reviewing the wisdom of statutes"—a proposition that Judge Easterbrook takes *cum grano salis,* of course. Easterbrook, "The Constitution of Business," 11 Geo.Mason U.L.Rev. 53 (1988).

Although the statute at issue in *Turner Elkhorn* involved compensation for illness or death, as opposed simply to meeting a "generalized need for funds" on the part of former employees, *Turner Elkhorn,* 428 U.S. at 19, 96 S.Ct. at 2894, no such distinguishing factor was present in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). The statute at issue in *Gray,* the Multiemployer Pension Plan Amendments Act of 1980, required an employer withdrawing from a multi-employer pension plan to pay a share of the plan's unfunded vested liabilities. A unanimous Supreme Court held that it was not unconstitutional, under the Due Process Clause, for Congress to make this new requirement retroactive to the time when the legislation had first been proposed. If a rational legislative purpose justifies a Congressional decision to give a statute retroactive application, *Gray* declared, retroactive application meets the test of due process. *Id.* at 730, 104 S.Ct. at 2718.

---

**6.** Quoting this passage only, the defendant trustees assert that "[i]n deciding *Alton* the Court relied on the commerce clause, not on the due process clause...." Appellees' brief, p. 37. The trustees' assertion is a puzzling one. At the beginning of the very paragraph containing the quoted passage the Court declared flatly that "the Act is invalid because several of its inseparable provisions contravene the due process of law clause of the Fifth Amendment." Even the four justices who dissented agreed that it was "arbitrary," and thus beyond the power of Congress, to require carriers to provide retirement benefits for persons who had already left railroad service. *Id.* at 389, 55 S.Ct. at 779. This reading of the *Alton* dissent is confirmed by *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 19 n. 18, 96 S.Ct. 2882, 2894 n.18, 49 L.Ed.2d 752 (1976).

In *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), the Supreme Court upheld the same statute against several constitutional challenges—including a substantive due process challenge—not based on retroactivity. The employer in *Concrete Pipe* had withdrawn from a multi-employer pension plan at a time when, the employer asserted, none of its employees had acquired vested rights to benefits under the plan; consequently, the employer argued, to require it to bear any part of the plan's unfunded vested liability was irrational. In rejecting this argument the Court pointed to "the deferential standard of review applied in substantive due process challenges to economic legislation;" under this "deferential" standard, the Court declared "there is no need for mathematical precision in the fit between justification and means." *Id.* at ——, 113 S.Ct. at 2288.

As the district court concluded in the case at bar, the requirement that the plaintiff companies make transition rule payments to the Combined Fund is analogous to the requirement, imposed by the statute upheld in *Gray* and *Concrete Pipe,* that companies withdrawing from multi-employer pension plans make payments to reduce the unfunded vested liabilities of the plans. 823 F.Supp. at 1402. The district court likewise concluded that Congress acted rationally in requiring the plaintiffs to continue providing benefits under their individual employer plans. *Id.* at 1405. The plaintiffs, as we have indicated, do not directly challenge either of these conclusions.

What the plaintiffs contend, rather, is that Congress acted irrationally in not providing for refunds, credits or offsets. But if the newly imposed burdens are themselves rational, it is far from clear to us that a rational legislative purpose need be shown for the failure of Congress to include other provisions designed to lighten the burdens. It is important to remember, in this connection, that the big-ticket expenditures for which the

plaintiffs would like to receive credit—the contractual withdrawal liability payments under the 1988 agreement—were not mandated by the Coal Act at all. It would doubtless have been rational for Congress to have decided that employers should receive credit for such voluntarily-incurred obligations, but we would be taking on quite a task if we began analyzing the rationality of not including in a legislative enactment every provision that might rationally have been included.

The number of rational provisions that might conceivably have been added to the Coal Act to ameliorate the burden on the plaintiffs or other employers would appear to be limited only by the ingenuity of counsel. Must each omission be justified as rational? Must Congress, in other words, have a rational basis for failing to act? We doubt it. "Not doing," as common law judges put it six or seven centuries ago, "is no trespass."

In the context of economic legislation, any other rule would be highly problematic. When imposing federal income taxes, for example, Congress may decide to allow a percentage depletion deduction for taxpayers engaged in mining activities—but this does not mean that Congress must allow a corresponding deduction for taxpayers engaged in work of the mind. Failure to provide the latter deduction might be thought unfair—mental resources are exhausted, over time, just as surely as physical resources are—but the tax code does not violate due process merely because it is perceived to be unfair. "[T]he Constitution [does not] require that legislation on economic matters be compatible with sound economics *or even with normal fairness.*" *Turner Elkhorn,* 428 U.S. at 44, 96 S.Ct. at 2906 (Powell, J., concurring) (emphasis supplied).[7]

The Coal Act may be unwise or unfair in not providing the refunds, credits or offsets that the plaintiff companies would have liked it to provide, but the Supreme Court continues to insist that "it is, by now, absolutely clear that the Due Process Clause does not

---

7. Neither does the Constitution require that legislation on economic matters be free of garden variety mistakes. If Congress did not really intend that companies with no retirees in the Com-

bined Fund be permanently stuck with transition rule payments to that fund, it is up to Congress to correct its error.

empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) (internal quotes and citations omitted). If we take the Court at its word, the plaintiffs' remedy lies not with the judicial branch, but with the legislative branch.

The plaintiffs tell us that Daniel Rostenkowski, when he was a member of Congress, said that the House of Representatives had agreed to the Coal Act only reluctantly and intended to reconsider it "to discuss, for instance, why companies that had paid a withdrawal liability under the 1988 collective bargaining agreement should not be able to claim a credit for that payment against their new liability, rather than paying twice for the same retirees." Reply brief, p. 9, quoting 138 Cong.Rec.House H11408 (Daily Ed. Oct. 5, 1992). But as far as the largest new liability imposed on the plaintiffs by the Coal Act is concerned—the liability for retirees enrolled in the plaintiffs' individual employer plans—it is not entirely accurate to suggest that the plaintiffs' decision to go out of the coal business while the 1988 collective bargaining agreement was in force set the plaintiffs up to pay "twice for the same retirees." The retirees who are enrolled in the multiemployer plans to which the plaintiffs made contractual withdrawal liability payments are not the same retirees for whom the Coal Act provides continuing coverage under the individual employer plans. The plaintiffs may have expected their individual plan retirees to be able to obtain coverage under the 1974 plan—the cost of which coverage would have been significantly greater than the amount contributed to the 1974 plan by the plaintiffs in withdrawal liability payments—but "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2292, quoting *Turner Elkhorn,* 428 U.S. at 16, 96 S.Ct. at 2893.

Congressman Rostenkowski evidently saw the issue of whether companies should be able to claim a credit for withdrawal liability payments as an issue for the legislature. In this he was surely correct. If the Coal Act is to be rewritten, it is Congress, not the courts, that will have to do the rewriting.

## III

■ The plaintiffs' due process arguments having been rejected, "it would be surprising indeed to discover" that the challenged statute nonetheless violates the Takings Clause. *Connolly v. Pension Benefit Guaranty Corporation,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986); *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2289. In the light of *Connolly,* we discern no Takings Clause violation.

*Connolly* is yet another decision upholding the constitutionality of the Multiemployer Pension Plan Amendments Act of 1980. The employer in that case had been a signatory to a pension plan trust agreement providing in so many words that the employer's obligation for pension benefits was ended when the employer made a specified contribution to the trust. *Connolly,* 475 U.S. at 218 and n. 2, 106 S.Ct. at 1022 and n. 2. The employer made the specified contribution and withdrew from the plan, but the Amendments Act said that the employer's obligation was not ended and that the employer would have to pay more than it had agreed to pay. A unanimous Supreme Court held that the imposition of this noncontractual liability—a liability that reduced the employer's net worth by nearly 25 percent—did not violate the Takings Clause.

"[T]he United States has taken nothing for its own use," the *Connolly* Court said, "and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose. That the statutory withdrawal liability will operate in this manner and will redound to the benefit of pension trusts does not justify a holding that the provision violates the Taking Clause and is invalid on its face." *Id.* at 224, 106 S.Ct. at 1026.

The Supreme Court has developed no set formula for identifying a forbidden "taking," and has relied instead on "ad hoc, factual inquiries into the circumstances of each particular case." *Id.* The Court has, however,

"identified three factors which have 'particular significance'" in this connection. *Id.* at 224–25, 106 S.Ct. at 1025–26. The three factors are as follows:

"(1) 'The economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Id.* at 225, 106 S.Ct. at 1026, quoting *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

The *Connolly* Court's examination of the Multiemployer Pension Plan Amendments Act in light of these three factors "reenforce[d]" its "belief that the imposition of ... liability does not constitute a compensable taking under the Fifth Amendment." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026. We have no reason to suppose that, given the facts of the instant case, consideration of the same factors here would lead the Supreme Court to conclude that the Coal Act's imposition of the liabilities described in Part I of this opinion constituted a compensable taking of the plaintiffs' property. The plaintiffs do not contend otherwise; they simply argue that the failure of Congress to provide for refunds, offsets or credits constituted a compensable taking. For the reasons already suggested, we do not find the argument persuasive.

**AFFIRMED.**