Michael H. HOLLAND, Marty D. Hudson, Thomas F. Connors, and Robert T. Wallace as Trustees of the United Mine Workers of America 1992 Benefit Plan, Plaintiffs,

v.

DOUBLE G COAL CO., INC., Defendant.

Civ. A. No. 1:94–0378.

United States District Court,
S.D. West Virginia,
Bluefield Division.

Sept. 28, 1995.

David W. Allen, Kenneth M. Johnson, Christopher F. Clarke, Sr., UMWA Health & Retirement Funds, Office of the General Counsel, Washington, DC, Gary A. Collias,

McIntyre & Collias, Charleston, WV, for plaintiffs.

Alvin E. Gurganus, Princeton, WV, for defendant.

## MEMORANDUM OPINION

FABER, District Judge.

### I. STATEMENT OF THE CASE

Plaintiffs, Trustees of the United Mine Workers of America 1992 Benefit Plan ("1992 Plan"), filed the present action seeking to recover unpaid premiums from defendant, Double G Coal Co., Inc. ("Double G").[1] Plaintiffs allege that section 9712[2] of the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act") requires Double G to pay premiums to the 1992 Plan. Currently pending before the court is plaintiffs' Motion for Summary Judgment, which has been fully briefed by the parties and is mature for the court's consideration.

Double G began coal mining operations on August 29, 1986, and ceased all operations on August 1, 1991, because no more coal was recoverable from the mine. On August 9, 1988, Double G had signed the 1988 National Bituminous Coal Wage Agreement. (Pl.'s Mem. in Support of Summ.J. at 9.) Double G has not been engaged in any business activity since August 1, 1991. (Def.'s Response to Pl.'s Motion for Summ.J. at 1.) It is undisputed that Double G ceased providing retirement benefits to its employees when it went out of business.

Double G contends that since it is no longer in business, it is not required to make further payments under the Act. The trustees of the 1992 Plan contend that Double G is required to pay premiums to the 1992 Plan under section 9712 of the Coal Act, whether or not Double G remains in business. Thus, the plaintiffs allege that there is no genuine issue of material fact and summary judgment under Rule 56 should be granted in their favor.

1. The original complaint named three other defendants, J.W. Clines Coal, Inc., E.L. Coal, Inc., and Burke Mountain Coal Company, Inc. These three defendants were dismissed without prejudice by stipulation filed on January 31, 1995.

### II. STANDARD UNDER RULE 56

Rule 56 of the Federal Rules of Civil Procedure provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2553.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict....

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 250–251, 106 S.Ct. at 2511–2512.

2. Statutory citations in this opinion refer to sections of the Coal Act as numbered in the United States Code Annotated.

## III.  ANALYSIS

■ The issue before the court is whether Double G must remain in business in order to be liable for contributions to the 1992 Plan under section 9712 of the Coal Act.  Section 9712(d)(1) provides that:

In general.—all 1988 last signatory operators shall be responsible for financing the benefits described in subsection (c) in accordance with contribution requirements established in the 1992 UMWA Benefit Plan.  Such contribution requirements, which shall be applied uniformly to each 1988 last signatory operator, on the basis of the number of eligible and potentially eligible beneficiaries attributable to each operator, shall include:

(a) the payment of an annual prefunding premium for all eligible and potentially eligible beneficiaries attributable to a 1988 last signatory operator,

(b) the payment of a monthly per beneficiary premium by each 1988 last signatory operator for each eligible beneficiary of such operator who is described in subsection (b)(2) and who is receiving benefits under the 1992 UMWA Benefit Plan, . . . .

26 U.S.C. § 9712(d)(1).  For the purposes of section 9712, the term "1988 last signatory operator" means a last signatory operator which is a 1988 agreement operator.  26 U.S.C. § 9712(d)(6).  The term "1988 agreement operator" is defined as an employer in the coal industry which was a signatory to the 1988 National Bituminous Coal Wage Agreement, and a "last signatory operator" is a signatory operator which was the most recent coal industry employer of a coal industry retiree.  26 U.S.C. § 9701(c).

Double G was an employer in the coal industry and signed the 1988 National Bituminous Coal Wage Agreement on August 9, 1988; thus, Double G fits the definition of "1988 agreement operator" set forth in section 9701(c)(3) of the Coal Act.  Accordingly, Double G qualifies as the "1988 last signatory operator" with respect to all employees who were last employed in the coal industry by Double G.  Since the language of the Coal Act explicitly provides that "all 1988 last signatory operators shall be responsible for . . . contribution requirements established in the 1992 UMWA Benefit Plan," the plaintiffs contend that defendant is required to pay premiums under the 1992 Plan even though it ceased mining coal and went out of business in 1991.

Conversely, Double G maintains that it is not required to pay the premiums described in section 9712 because the company has not remained in business since August 1, 1991.  Accordingly, this court must determine whether the fact that Double G ceased its business operations on August 1, 1991, is relevant to the defendant's obligation to pay an annual prefunding premium and monthly per-beneficiary premiums to the 1992 Plan.

A brief discussion of the historical background of health benefits for coal miners is necessary to gain an understanding of the Coal Act.  The 1992 Plan and a Combined Benefit Plan were created by the Coal Act in an attempt to transform the benefit structure for retired employees of coal companies.  The history of the Coal Act makes clear that Congress's purpose was to insure adequate funding of benefit plans by requiring signatories of past plans to contribute to the new plans.[3]  As explained by this court in *Holland v. American Coal Co., Inc.*, 868 F.Supp. 173 (S.D.W.Va.1994),

Prior to the passage of the Coal Act in 1992, health benefits for retired coal miners were provided through two health benefit trusts, the United Mine Workers of America 1950 Benefit Plan ("1950 plan") and the United Mine Workers of America 1974 Benefit Plan ("1974 plan").  As the coal mining industry steadily declined throughout the 1970's and 1980's, and health care costs rose, these retirement plans were adversely affected.  In an attempt to strengthen health care benefits,

---

**3.** The history, structure and purpose of the Coal Act are explained by Judge James L. Graham in a comprehensive opinion upholding the constitutionality of the Act.  *See Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. 1395 (S.D.Ohio 1993).  An equally helpful analysis was written by Chief Judge Charles H. Haden II of this district recently in *Carbon Fuel Co. v. USX Corp.*, 891 F.Supp. 1186 (S.D.W.Va.1995).

the 1974 plan was restructured in 1978, and again in 1988.

However, as each successive plan expired, employers were leaving the coal mining business and claiming that their obligation to provide health benefits ceased with the expiration of the last National Bituminous Coal Wage Agreement ("NBCWA") that the company had signed. As a result, fewer NBCWA signatories were responsible for greater numbers of retired coal miners, and by the late 1980's, the 1950 and 1974 plans were unable to provide sufficient health care benefits to UMWA retirees. (Citation omitted.)

. . . .

Based on the historical background of the Coal Act, it is apparent that Congress found that underfunding of the health benefit plans was due, in large part, to the practice of employers withdrawing from the industry and terminating their obligations under the NBCWA, thereby "dumping" their retired employees. (Citation omitted.)

*American Coal*, 868 F.Supp. at 174–175.

Turning to an analysis of the statute, the language of section 9712, the section of the Coal Act which relates to the 1992 Plan, indicates that *"[a]ll 1988 last signatory operators shall be responsible for financing the benefits. . . ."* (Emphasis added.) The language of section 9712 does not limit the section's application to signatory operators which remain in business. In contrast to section 9712, the application of two sections of the Coal Act, 9706 and 9711, is expressly limited to companies which remain in business.[4] Section 9706 covers the assignment of eligible beneficiaries under the Combined Fund to signatory operators who must then make contributions to the Combined Fund on behalf of such eligible beneficiaries. Such assignments may be made only to signatory operators who remain in business. Section 9711 requires those employers who provided health benefits to employees under individual employer plans maintained pursuant to a 1978 or subsequent coal wage agreement to continue to provide such benefits, but only so

long as such employers remain in business. Defendant argues that the provisions in sections 9706 and 9711 which limit their application to employers remaining in business, supported by common sense, demonstrate a congressional intent to limit liability for contributions under all sections of the Coal Act to those employers who remain in business when the payments come due.

The structure of the Coal Act, however, suggests otherwise. As the court points out in *Barrick Gold Exploration*, the Act sets up three vehicles to provide health care benefits for coal industry retirees: (1) merger of the 1950 and 1974 benefit plans into the Combined Fund; (2) requiring signatory operators who are obligated under the 1978 or any later NBCWA to provide benefits under an individual employer plan to continue to provide such coverage to certain retirees; and (3) establishment of the 1992 Benefit Plan to cover two classes of beneficiaries who are not covered under the Combined Fund or individual employer plans: (a) those persons who, based on age and service as of February 1, 1993, would otherwise have been eligible for benefits from the 1950 or 1974 plans were it not for the merger of those plans and the cut-off date set forth in the Coal Act, and (b) any person with respect to whom coverage under an individual employer plan is required but is not provided. This structure points to the conclusion that the 1992 Benefit Plan is designed to "backstop" the first two vehicles of health coverage and provide coverage for those who do not receive benefits under the Combined Fund or individual employer plans.

It should be noted that the Coal Act is a statute designed to remedy defects in *past* benefit coverage; it does not address the provision of benefits to those who retire after September 30, 1994, or meet age and service requirements after February 1, 1993. *Barrick Gold Exploration*, 823 F.Supp. at 1400. The group of coal industry employees covered by the 1992 Benefit Plan is therefore finite and limited. Employers required to pay into the Plan are not obligated to assume responsibility for an ever-expanding group of

---

**4.** Section 9701(c)(7) specifically defines "in business" under the Act to include conducting or

deriving revenue from any business activity, whether or not in the coal industry.

beneficiaries; at some point membership in the group of beneficiaries under the 1992 Plan will be closed.

Viewed against this structure and the purpose of the Coal Act, it makes sense for Congress to have exempted employers no longer in business from the requirements of sections 9706 and 9711, but not from section 9712. Therefore, the court concludes that, by not including the term "remaining in business" in section 9712, Congress must have intended section 9712 of the Coal Act to apply to all 1988 last signatory operators, whether or not they remain in business. In reaching this conclusion, the court notes that the principal problem with prior plans that the Coal Act was designed to remedy had been caused by coal operators ceasing business and "dumping" those employees for whom they were obligated to provide benefits. The complete exemption from coverage of the Act of those companies who are no longer in business would resurrect to some degree the very problem the Act was designed to remedy. Furthermore, exempting companies no longer in business from some parts of the Coal Act and not others may well represent a legislative compromise necessary to obtain the passage of a remedial bill.

In *Holland v. American Coal Co., Inc.,* this court determined that American Coal, which was a 1988 agreement operator, was obligated under section 9704 of the Coal Act to pay required first year contributions to the Combined Fund, even though the company was no longer in business. In the present case, plaintiffs are trustees of the 1992 Plan and are seeking to recover contributions to the 1992 Plan under section 9712, whereas the plaintiffs in *American Coal* were seeking to recover contributions to the Combined Fund under a different section of the Coal Act. However, the court's analysis in *American Coal* remains applicable. There, the court reasoned that, since Congress did not exempt employers no longer in business from the specific section of the Coal Act under

consideration, the clear language of that section included all described employers whether still in business or not.

Thus, Congress specifically exempted companies no longer in business from some sections of the Coal Act, but not others. The duty of this court is to give effect to the plain meaning of the statute, not to pass judgment on its wisdom or fairness. As the court implicitly concluded in *American Coal,* we must assume that if Congress had intended to exempt companies no longer in business from all of the provisions of the Coal Act, it would have so indicated. Instead, it exempted such companies from some provisions of the Act, but not others. Section 9712 contains no such exemption and this court declines to change the plain meaning of that statute by writing such an exemption into it.

Therefore, the court holds that Double G is responsible for payments under section 9712, whether or not the company remained in business, to the extent that Double G fits within the definition of a 1988 last signatory operator. As stated by this court in *American Coal,*

> to hold otherwise would contravene the intent of Congress in enacting the Coal Act. As stated above, the problems leading to the passage of the Coal Act were due, in part, to coal companies which were going out of business and contending that their obligation to provide health benefits ceased with the expiration of the last NBCWA they signed. This is exactly what [Double G] is attempting to do, and it is contrary to the language of the Coal Act and the intent behind the Act.

*American Coal,* 868 F.Supp. at 176.[5]

■ Having concluded that Double G is responsible for financing the benefits described in section 9712, the court must determine exactly what amount is owed to the 1992 Plan by Double G. Section 9712(d)(1) provides that Double G must contribute an annual prefunding premium and monthly per

---

5. The court recognizes that many operators who become liable for contributions under the rule of this case will have no assets, having been forced out of business by economic exigencies. This will not necessarily be true in all cases, however.

It is possible that some companies no longer in business retain assets generated by profits from their previous mining operations; the Trustees should be free to pursue collection efforts against such companies.

beneficiary premiums for each eligible and potentially eligible beneficiary for whom Double G is the 1988 last signatory operator. Affidavits provided by plaintiffs indicate that there are seven retired employees of Double G who were last employed by Double G and who are age and service eligible for benefits from the 1992 Plan. Thus, Double G qualifies as the last signatory operator with respect to these seven retired employees. There are also thirteen beneficiaries who are eligible to receive benefits from the 1992 Plan and are attributable to Double G by reason of a relationship to one of the seven retired employees. *See* 26 U.S.C. § 9701(c)(6). (Aff. of Kyu W. Lee ¶¶ 4–8.) Thus, Double G is responsible, under section 9712(d)(1), for paying premiums to the 1992 Plan for twenty eligible beneficiaries.

## IV. CONCLUSION

Under the Coal Act, Double G Coal Company is responsible for paying premiums to the 1992 Plan whether or not the company remains in business. Based on uncontroverted affidavits submitted by plaintiffs, Double G Coal Company is the 1988 last signatory operator with respect to twenty eligible beneficiaries, and as such, is required to pay premiums for these beneficiaries under section 9712(d)(1)(A) & (B).

As it is undisputed that Double G Coal Co. has not paid the amount due to the 1992 Plan, as calculated and described in Plaintiffs' Motion for Summary Judgment, Exhibit 3, there is no genuine issue of material fact remaining in this action. For the reasons herein stated, the court will, in a separate judgment order on this date, grant summary judgment in favor of the plaintiffs. The specific dollar amount of the judgment will be calculated from the evidence of record and included in the court's judgment order.

### *JUDGMENT ORDER*

In accordance with the Memorandum Opinion entered this date, the court hereby ORDERS as follows:

1. The motion for summary judgment filed by plaintiffs Michael H. Holland, et al., on February 28, 1995, is hereby GRANTED;

2. Judgment is entered in favor of plaintiffs in the amount of $210,344.63 which includes: (1) monthly per-beneficiary premiums for twenty beneficiaries in the principal amount of $164,059.60, as calculated through August of 1995; (2) annual prefunding premium for 1994 in the amount of $1,400; (3) annual prefunding premium for 1995 in the amount of $2,420; (4) liquidated damages in the amount of $33,575.92, which is calculated as twenty percent of the principal amount; (5) interest on both the annual and monthly premiums, which has been calculated through February 24, 1995, in the amount of $8,121.11, and which continues to accrue daily at a rate of eight percent, and (6) reasonable attorney's fees and costs of the action in the amount of $768.00; and

3. This action is DISMISSED with prejudice.

The Clerk is directed to remove this action from the docket of this court and is further directed to forward certified copies of this Judgment Order to all counsel of record.

IT IS SO ORDERED this twenty-eighth day of September, 1995.