159 F.3d 62
 22 Employee Benefits Cas. 1948
 In re OLGA COAL COMPANY, Debtor.
Joel LEWITTES, as Chapter 11 Trustee of Olga Coal Company,
Plaintiff-Counter-Defendant-Appellant,
v.
Thomas F. CONNORS, Michael H. Holland, Marty D. Hudson and
Robert T. Wallace, as Trustees of the United Mine
Workers of America 1992 Benefit Plan,
Defendants-Counter-Claimants-Appellees,
The United Mine Workers of America 1992 Benefit Plan,
Defendant-Counter-Claimant-Appellee.
 Docket No. 97-5071
 United States Court of Appeals,
Second Circuit.
 Argued April 30, 1998.
Decided Oct. 15, 1998.
 
 Martin G. Bunin, New York, NY (Jill R. Franco, Reid & Priest LLP, New York, NY, of Counsel), for Plaintiff-Counter-Defendant-Appellant.
 Jami Wintz McKeon, Philadelphia, PA (Tracy Zurzolo Frisch, Morgan, Lewis & Bockius, LLP, Philadelphia, PA; Paul A. Green, John R. Mooney and Elizabeth A. Saindon, Mooney, Green, Baker, Gibson & Saindon, PC, Washington, DC, On Brief), for Defendants-Counter-Claimants-Appellees.
 Before: NEWMAN and LEVAL, Circuit Judges, and WEXLER, District Judge.*
 LEVAL, Circuit Judge:
 
 
 1
 This appeal raises the question whether Section 9712 of the Coal Industry Health Benefit Act of 1992, 26 U.S.C. § 9701 et seq., requires a coal operator that is no longer "in business" to contribute to the United Mine Workers of America 1992 Benefit Plan. The district court held that it does. We agree and affirm.
 
 Background
 
 2
 Olga Coal Co. ("Olga") and its predecessors operated a deep coal mine in West Virginia from 1912 through the end of 1986. Olga filed for bankruptcy under Chapter 11 in February 1987. It permanently closed its mine in June 1987. Although Olga conducts no business operations, it holds nearly $4 million in bank accounts and certificates of deposit. Olga remains a chartered West Virginia corporation and continues to file income tax returns. The company has no employees, but does retain two former employees on an independent contract basis, primarily to keep its books and make required filings.
 
 
 3
 Since 1950, the National Bituminous Coal Wage Agreements ("NBCWAs") between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association ("BCOA"), an association of coal producers, have provided for health care benefits for active and retired coal miners. See Davon Inc. v. Shalala, 75 F.3d 1114, 1117 (7th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). As a member of the BCOA, Olga was a signatory to the 1950 NBCWA and successive NBCWAs through 1984.[1]
 
 
 4
 From 1950 through 1974, health and pension benefits to miners were provided through the UMWA 1950 Welfare and Retirement Fund ("the W & R Fund"), a multi-employer trust funded by participating coal concerns ("signatory operators"). See In re Chateaugay Corp., 53 F.3d 478, 481-82 (2d Cir.1995), cert. denied, 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995); Davon Inc., 75 F.3d at 1117.
 
 
 5
 In 1974, in response to concerns about the actuarial soundness of the W & R Fund and passage of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., the union and the operators agreed to revise the benefits administration structure. See United Mine Workers of America Health and Retirement Funds v. Robinson, 455 U.S. 562, 566, 102 S.Ct. 1226, 1229, 71 L.Ed.2d 419 (1982). The 1974 NBCWA divided the 1950 W & R Fund into four multi-employer trusts, two of which--the 1950 UMWA Benefit Trust ("the 1950 Trust") and the 1974 UMWA Benefit Trust ("the 1974 Trust")--financed health benefits.[2] See id.; see also Coal Commission Report: A Report to the Secretary of Labor and the American People 23-26 (1990). The 1950 Trust was designed to provide health benefits only to miners who retired before January 1, 1976. The 1974 Trust was created to provide health coverage to active miners and to miners who retired after January 1, 1976. See Barrick Gold Exploration, Inc. v. Hudson, 823 F.Supp. 1395, 1398 (S.D.Ohio 1993), aff'd, 47 F.3d 832 (6th Cir.1995), cert. denied, 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995); Coal Commission Report at 24.
 
 
 6
 Shortly thereafter, a confluence of events--including a decline in coal production, a surge in retirements, and escalating health costs--resulted in severe financial problems for the 1950 and 1974 Trusts. See Eastern Enters. v. Apfel, --- U.S. ----, ---- - ----, 118 S.Ct. 2131, 2138-39, 141 L.Ed.2d 451 (1998)(plurality opinion). In response, the 1978 NBCWA shifted responsibility for health coverage for active miners and miners who retired after 1975 from the multi-employer funds to individual employer plans ("IEPs"). See Davon Inc., 75 F.3d at 1118. Retirees covered under the 1950 Plan continued to receive health benefits from the 1950 Trust. The 1974 Trust survived, but only to provide benefits to "orphans," i.e., miners who retired after January 1, 1976 and whose last employer was no longer in business. See In re Chateaugay, 53 F.3d at 482; Barrick Gold, 823 F.Supp. at 1398-99. The basic structure of the 1978 NBCWA has been maintained in successive NBCWAs, including the most recent 1988 agreement. See Davon Inc., 75 F.3d at 1118.
 
 
 7
 By the late 1980s, the two Trusts "had sunk into deep financial crisis." In re Chateaugay, 53 F.3d at 483. As NBCWA operators left the increasingly unprofitable coal business, responsibility for a growing number of "orphan" retirees fell to a dwindling number of contributors to the 1974 Trust. See Barrick Gold, 823 F.Supp. at 1399. At the same time, health care costs continued to rise precipitously, exacerbating the strain on the Trusts. See In re Chateaugay, 53 F.3d at 484. "In short, an ever-smaller number of mining companies incurred the increasing costs of providing benefits to ever-greater numbers of retirees." Id. Congress responded by enacting the Coal Industry Retiree Health Benefits Act of 1992, Pub.L. No. 102-486, 106 Stat. 2776, 3036-56 (codified at 26 U.S.C. §§ 9701-9722) ("the Coal Act" or "the Act"). The Act required all current and former signatory operators--i.e., any coal company that "is or was a signatory to a[n NBCWA]"--to fund the benefits of retirees properly attributable to it, and to share in the cost of providing benefits to orphaned retirees. See In re Chateaugay, 53 F.3d at 485; In re Leckie Smokeless Coal Co., 99 F.3d at 573, 576 (4th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1251, 137 L.Ed.2d 332 (1997).
 
 
 8
 The Coal Act provides three vehicles for funding health care benefits for retired miners. First, the Act merged the 1950 and 1974 Plans into a Combined Benefit Fund ("the Combined Fund"). The beneficiary class of this fund is limited to retirees (and their dependents) who, as of July 20, 1992, were actually receiving benefits under the 1950 Trust or the 1974 Trust. See 26 U.S.C. § 9703(f). The Combined Fund is financed by annual per-beneficiary premiums paid by "assigned operators" designated by the Commissioner of Social Security on the basis of the beneficiary's work history. See § 9704 (outlining structure of liability of assigned operators); § 9706(a)(1) (providing criteria for assignment of beneficiaries to signatory operators).[3] Only coal operators still "in business" within the definition of the Coal Act can be liable to the Combined Fund. See § 9706(a).
 
 
 9
 Second, the Act provides for continuing IEP coverage for employees who, as of February 1, 1993, were receiving benefits under an IEP or who are eligible for benefits and retire on or before September 30, 1994. 26 U.S.C. § 9711(a), (b). Any NBCWA signatory that is the most recent coal industry employer of an eligible beneficiary (a "last signatory operator") and has been providing coverage under an IEP must continue to provide such coverage to that beneficiary so long as it remains in business, irrespective whether the operator chooses to participate in future NBCWAs. § 9711(a); see also Barrick Gold,, 823 F.Supp. at 1400.
 
 
 10
 Third, to protect retirees otherwise ineligible for benefits, the Act created the 1992 UMWA Benefit Plan ("the 1992 Plan"). See § 9712(b)(1); Holland v. Double G Coal Co., Inc., 898 F.Supp. 351, 354 (S.D.W.Va.1995) ("[T]he 1992 Benefit Plan is designed to 'backstop' the first two vehicles of health coverage for those who do not receive benefits under the Combined Fund or [IEPs]."). The 1992 Plan provides coverage for (1) persons who would have been eligible for benefits under the Combined Fund but for its July 1992 eligibility cut-off, § 9712(b)(2)(A), and (2) persons orphaned by an IEP funder's going out of business. § 9712(b)(2)(B). Only retirees who retired before October 1, 1994 are eligible for 1992 Plan coverage. The 1992 Plan thus covers pre-October 1994 retirees whose last employer was no longer in business as of the effective date of the Act (and who therefore are not "assignable" under the Combined Fund), or who become orphaned after the effective date. The 1992 Plan is financed by monthly, per-beneficiary premiums paid by the last signatory operators of Plan beneficiaries, and is secured by annual prefunding premiums and additional security payments by 1988 last signatory operators. See § 9712(d)(1),(3); Barrick Gold, 823 F.Supp. at 1400. In contrast to §§ 9706 and 9711, § 9712 contains no language limiting its applicability to signatory operators that remain in business.
 
 
 11
 Plaintiff Joel Lewittes, Olga's Chapter 11 Trustee ("Olga"), brought this suit against the 1992 Plan seeking a declaratory judgment that Olga is not liable for employee health benefit premiums under § 9712. In the district court, Olga did not dispute that it is the last signatory operator to employ some retired miners covered by the 1992 Plan. Instead Olga argued that § 9712 limits liability to the 1992 Plan to operators who are still "in business" and that it is no longer "in business" within the statutory meaning. The district court dismissed the suit. Citing Double G Coal Co., which rejected a similar argument on the basis of the "structure and purpose of the Coal Act," 898 F.Supp. at 355, the court found that "section 9712 does not require that a last signatory operator be 'in business' in order to be liable for contributions to the 1992 Benefit Plan." In re Olga Coal Co., No. 94 Civ. 5647(JSM), 1997 WL 598455 at * 1 (S.D.N.Y. Sept. 25, 1997). Accordingly, the district court granted summary judgment for the Plan. We affirm.
 
 Discussion
 
 12
 The relevant portion of § 9712 provides that "[a]ny last signatory operator who is not a 1988 last signatory operator shall pay the monthly per beneficiary premium ... for each eligible beneficiary ... attributable to that operator." 26 U.S.C. § 9712(d)(3). Olga does not dispute that it is the last signatory operator for certain retirees covered by the 1992 Plan. See A. 727-32. Olga contends, however, that § 9712 applies only to signatory operators still "in business," and thus does not apply to Olga.
 
 
 13
 Olga's interpretation finds no support in the words of the statute. The Act provides that liability to the Combined Fund or to IEPs is limited to operators still "in business." See §§ 9706(a), 9711(a). Regarding the 1992 Plan, however, Congress extended liability to "1988 last signatory operators," § 9712(d)(1), and other "last signatory operators", § 9712(d)(3), with no language limiting liability to operators still "in business." This unambiguous textual distinction strongly suggests that Congress intended to exempt signatory operators no longer in business from the requirements of §§ 9706 and 9711, but not from § 9712. See Double G Coal Co., 898 F.Supp. at 355 ("[W]e must assume that if Congress had intended to exempt companies no longer in business from all of the provisions of the Coal Act, it would have so indicated.").
 
 
 14
 Olga contends, nonetheless, that its position is supported by § 9706, which outlines procedures for apportioning liability to the Combined Fund. Section 9706(a) states: "For purposes of this chapter, the Commissioner of Social Security shall ... assign each coal industry retiree who is an eligible beneficiary to a signatory operator which ... remains in business...." Olga contends this passage demonstrates Congress's intent to restrict liability under all subchapters of the Coal Act--including § 9712--to signatory operators still "in business." Blue 10. It argues that the words "for purposes of this chapter" must cover the entire Coal Act as the Act has only one chapter. We disagree.
 
 
 15
 Olga's argument disregards the structure and purpose, as well as the language of the Act. Section 9706 is a part of Subchapter B of the Act, which encompasses §§ 9702 through 9708, and relates to the establishment, funding and operation of the Combined Fund (which is funded by operators who remain in business). Section 9706 concerns the assignment of eligible beneficiaries to respective operators who remain in business to determine their liability to the Combined Fund.
 
 
 16
 Subchapter C, divided into two parts, relates to funding outside the scope of the Combined Fund. Part I of Subchapter C, which consists of § 9711, pertains to IEPs, which are also funded by operators that remain in business. § 9711(a). Part II, which consists of § 9712, establishes and governs the 1992 Benefit Plan, which is funded by "1988 last signatory operators," § 9712(d)(1), and "[a]ny last signatory operator who is not a 1988 last signatory operator." § 9712(d)(3).
 
 
 17
 Thus, notwithstanding § 9706's use of the phrase, "[f]or purposes of this chapter," its commands relate to a coverage that is not only different from, but mutually exclusive of, the coverage of § 9712. Section 9706(a), in the passage on which Olga relies, assigns retirees who are eligible beneficiaries to signatory operators that remain in business for the purpose of determining the premium to be paid by such operators to the Combined Fund under § 9704(b)(1). Section 9712, in contrast, provides coverage "only ... [to one] who is not eligible for benefits under the Combined Fund." § 9712(b)(1). The very purpose of the establishment of 1992 UMWA Benefit Plan by § 9712 was to provide for retirees who were not covered by either the Combined Fund or an IEP.
 
 
 18
 The fact that § 9706(a) provides for the assignment of retirees eligible for the benefit of the Combined Fund to operators that "remain[ ] in business" does not suggest that Congress intended, in § 9712(d), to place a similar but unwritten limitation on the identification of operators who would fund retirees not eligible for the Combined Fund. It seems far more sensible to conclude that the Act means what it says, limiting to operators that remain in business liability for the funding of the Combined Fund, §§ 9704(b)(1), 9706(a), and IEPs, § 9711, but, in § 9712(d), imposing on all operators liability for the funding of the 1992 UMWA Benefit Plan which provides for retirees who were not receiving benefits under either the Combined Fund or the IEPs.
 
 
 19
 This common-sense reading gives practical expression to Congress's determination to insure the availability of "sufficient operating assets" to fund the multi-employer plans and, to the extent possible, to assign the cost of benefits to the operators "most responsible for plan liabilities." Coal Act of 1992, Pub.L. No. 102-486, §§ 19142(a)(2), (b)(2), 106 Stat. 3036, 3037, (1992)(not codified); see 26 U.S.C. 9701 Historical and Statutory Note (1998). Consistent with these objectives, interpreting § 9712 to reach signatory operators no longer "in business" at once extends the assets available to satisfy industry obligations to the 1992 Plan and enhances the Plan's ability to collect premiums from those operators that actually employed the beneficiaries. The interpretation advanced by Olga would reduce the resources available to the Plan and increase the likelihood that the cost of benefits would be borne by those remaining in the coal industry, rather than the operator most responsible for beneficiaries, in obvious derogation of Congress's declared purpose.
 
 
 20
 Interpreting § 9712 to reach signatory operators no longer "in business" also accords with the broader remedial purpose of the Act. The uncontrolled increase in "orphan" retirees was a leading cause of the insolvency of the earlier multi-employer trusts. See In re Chateaugay, 53 F.3d at 483-84; see also Double G. Coal Co., 898 F.Supp. at 355 ("[T]he principal problem with prior plans that the Coal Act was designed to remedy had been caused by coal operators ceasing business and 'dumping' those employees for whom they were obligated to provide benefits."). An important source of "orphans" as operators, which, like Olga, went out of business and repudiated their obligations to multi-employer health benefit funds, but nevertheless retained significant assets. See Holland v. American Coal Co., 868 F.Supp. 173, 176 (S.D.W.Va.1994) ("[T]he problems leading to the passage of the Coal Act were due, in part, to coal companies which were going out of business and contending that their obligation to provide health benefits ceased with the expiration of the last NBCWA they signed."). As the Double G court observed, "[t]he complete exemption from coverage of the Act of those companies who are no longer in business would resurrect to some degree the very problem the Act was designed to remedy." 898 F.Supp. at 355. We conclude that the language, structure and purpose of the Coal Act make plain that § 9712 imposes liability to the 1992 Plan upon all last signatory operators of Plan beneficiaries, not just those who remain "in business."[4]
 
 
 21
 We also reject Olga's contention that the legislative history supports its interpretation of the statute. Olga points to one passage from the lengthy floor remarks of Senator Rockefeller, the chief Senate sponsor of the Coal Act. See 138 Cong. Rec. 34034, 102nd Cong.2d Sess. (1992) (remarks of Sen. Rockefeller) ("In Section 9712(d)(3) the payments continue to be made for as long as the signatory operator--or any related person--remains in business."). "[S]uch isolated [floor] remarks are entitled to little or no weight" in statutory interpretation. Murphy v. Empire of America FSA, 746 F.2d 931, 935 (2d Cir.1984). More importantly, where, as here, the meaning of a statutory provision is otherwise unambiguous, resort to legislative history is inappropriate. See United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint, 34 F.3d 91, 98 (2d Cir.1994).
 
 Conclusion
 
 22
 The judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Leonard D. Wexler, United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Olga did not sign the 1988 NBCWA. Under the Coal Act, therefore, Olga cannot be a "1988 last signatory operator" and is exempt from various prepayments and security payments required by § 9712(d)(1). However, Olga is the "last signatory operator" for those miners who were most recently employed in the coal industry by Olga. See 26 U.S.C. § 9701(c)(4)
 
 
 [2]
 The other two trusts covered pension benefits and are not relevant to this litigation
 
 
 [3]
 While this appeal was sub judice, the Supreme Court held in Eastern Enters. v. Apfel that the liability allocation scheme of § 9706 violates the Takings Clause, at least as applied to operators who "neither participated in negotiations nor agreed to make contributions in connection with the Benefit Plans established under the 1974, 1978, or subsequent NBCWA's." 118 S.Ct. at 2135. Because Eastern Enters. was unconcerned with § 9712, see id. at 2142 n. 2 (plurality opinion), it does not affect our decision
 
 
 [4]
 Given our interpretation of § 9712, we need not decide whether Olga remains "in business."