**Michael H. HOLLAND,**
**et al., Plaintiffs,**

v.

**KITCHEKAN FUEL CORPORATION,**
**et al., Defendants.**

**No. Civ.A. 1:99–0398.**

United States District Court,
S.D. West Virginia,
at Bluefield.

March 30, 2001.

Gary A. Collias, McIntyre & Collias, Charleston, WV, David W. Allen, General Counsel, Office of the General Counsel, Washington, DC, Jonathan Sokolow, Asst. General Counsel, Larry D. Newsome, Assistant General Counsel, Office of the General Counsel, Washington, DC, David W. Allen, General Counsel, Office of the General Counsel, Washington, DC, for Plaintiffs.

Anna M. Dailey, Heenan, Althen & Roles, Forrest H. Roles, Heenan, Althen & Roles, Charleston, WV, John R. Woodrum, W. Gregory Mott, Heenan, Althen & Roles, Washington, DC, for Defendants.

## OPINION AND ORDER

FABER, District Judge.

Before the court is the Renewed Motion to Dismiss Jumacris Mining, Inc. ("Jumacris") filed on June 9, 2000. Also pending are the objections, filed on April 28, 2000, of Jumacris to an order of the magistrate judge granting plaintiffs' motion to compel discovery. For the reasons discussed below, the Renewed Motion to Dismiss Jumacris Mining, Inc. is **GRANTED**. The objections to the magistrate judge's discovery order are rendered moot by the dismissal of Jumacris and are therefore overruled. The stay, which the court imposed by order of June 5, 2000, is lifted; a new scheduling order will be entered consistent with this opinion.

### I. STATEMENT OF THE CASE

Jumacris was organized as a corporation under the laws of West Virginia in 1974. It was capitalized with a single class of common stock of 150 shares. Jumacris conducted deep coal mining operations at a series of mines located in Mingo County, West Virginia. Jumacris performed these operations as a contract miner for Gilbert Imported Hardwoods, Inc. ("Gilbert Hardwoods") which held coal leases on lands owned by United States Steel Corporation.

Jumacris was a signatory operator to the 1978 and 1981 National Bituminous Coal Wage Agreements with the United Mine Workers of America ("UMWA").

By 1982, Jumacris had shut down all its mines but one—Jumacris No. 4 located at Ben Creek, West Virginia. On or about June 24, 1982, Jumacris shut down its last mine, laid off its union workforce and permanently ceased operations. Jumacris was dissolved by order of the Circuit Court of Kanawha County, West Virginia, in September 1985. Most of its assets were transferred to Gilbert Hardwoods in partial satisfaction of debts owed to that corporation. Other assets, including some equipment, were transferred to third parties.

This action was filed on May 13, 1999, by the trustees of the United Mine Workers of America 1992 Benefit Plan ("1992 Plan") seeking unpaid contributions allegedly owed to the 1992 Plan by Jumacris, Gilbert Hardwoods and two other corporations, Kitchekan Fuel Corporation ("Kitchekan") and Lynn Land company ("Lynn Land"). The complaint charges that the defendants are "related persons" under the Coal Industry Retiree Health Benefit Act of 1992 ("the Coal Act"), 26 U.S.C. § 9712, and that they failed to pay required premiums to the 1992 plan for the months of February 1993 through April 1999. Plaintiffs claim that Jumacris owes $51,944.80, Kitchekan owes $54,495.86 and Lynn Land owes $167.59, for a total of $106,608.25, which is said to be the joint and several obligation of all four defendants.

One of the attorneys for the defendants accepted original service of process for all four defendants. Later, he informed plaintiffs' counsel that he had learned Jumacris had been dissolved and was therefore not a viable entity amenable to service of process. Thereafter, the present motion to dismiss Jumacris was filed. It is

contended that, as a dissolved corporation, Jumacris was not subject to service of process and also that, under West Virginia Code § 31–1–48, a dissolved corporation may not be sued more than two years after its dissolution.

## II. *The Standard for Summary Judgment*

The original motion to dismiss Jumacris was filed under Federal Rules of Civil Procedure, Rule 12(b)(2), lack of jurisdiction over the person; Rule 12(b)(4), insufficiency of process; and Rule 12(b)(5), insufficiency of service of process. The parties in their briefs have considered at length the additional issue of whether the statute of limitations for actions against dissolved corporations bars this action. This would appear to be an issue properly before the court under Rule 12(b)(6), failure to state a claim upon which relief may be granted, and the court will treat it as such.

█ The essential facts set out above were gleaned from, not only the pleadings, but also discovery responses filed with the court. The court's consideration of matters outside the pleadings on a Rule 12(b)(6) motion converts that motion to one for summary judgment under Rule 56. Accordingly, the court will apply the standard of review applicable to a Rule 56 motion, the parties through their briefs having by implicit agreement submitted the statute of limitations issue to the court for ruling.

The standard for a summary judgment motion is well-established. Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party. Of course, the nonmoving party must produce a certain quantity of evidence:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict. . . .

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 250–51, 106 S.Ct. 2505.

## III. *Discussion*

### *The 1992 Coal Act and its Progenies*[*]

Like the coal industry itself, the 1992 Act has a long and strife-laden history. In 1946, the UMWA went on strike for health and pension benefits. After years of conflict during which the miners were nationalized by presidential order on one occasion, the miners achieved their objective. The National Bituminous Coal Wage Agreement of 1950 was historic for a number of reasons. It was the first agreement

---

[*] The following discussion is based on more comprehensive historical summaries found in *In re Olga Coal Co.,* 159 F.3d 62 (2d Cir. 1998); *Davon, Inc. v. Shalala,* 75 F.3d 1114 (7th Cir.1996); and *In re Chateaugay Corp.,* 53 F.3d 478 (2d Cir.1995).

between the UMWA and the Bituminous Coal Operators Association ("BCOA"), a multi employer association of major coal and steel companies; it led to mechanization of the nation's coal mines, and it established the United Mine Workers Welfare and Retirement Fund of 1950 ("1950 Fund"). The 1950 Fund provided medical, death and other benefits to employees of signatory operators, their families and dependents.

In 1974, amid concern about the financial health of the 1950 Fund, the union and the coal operators agreed to amend the benefits structure. The National Bituminous Coal Wage Agreement of 1974 ("1974 Trust") divided the 1950 Fund into four multi employer trusts—two to provide health benefits and two to provide pensions. The two trusts designed to provide health benefits were the 1950 Trust, which covered miners who retired prior to January 1, 1976, and the 1974 Trust, which was created to cover active miners and those retiring after January 1, 1976.

Escalating health costs, an increase in retirements and declining coal production again brought the situation to a crisis. The 1978 National Bituminous Coal Wage Agreement attempted to provide a remedy through individual employer plans ("IEPs"). The 1950 Trust was continued in essentially its then existing form. The 1974 Trust was also continued, but only to provide benefits to miners retiring after January 1, 1976, who were not eligible for an IEP because their last employer was no longer in business. This solution proved unsatisfactory. As operators left the coal business, the number of "orphan" miners covered by the 1974 Trust grew while at the same time the number of contributors to this fund was shrinking.

Congress responded by passing the Coal Act in 1992. The Coal Act provides three vehicles for providing health care benefits to retired miners. It merged the 1950 and 1974 Trusts into a Combined Benefit Fund to cover retirees and their dependents who were receiving benefits under these trusts as of July 20, 1992; it provided for continued IEP coverage for employees who were receiving or who were eligible for benefits under an IEP as of February 1, 1993; and, it created the 1992 UMWA Benefit Plan ("the 1992 Plan") to cover retirees otherwise ineligible for benefits. As this court has previously said, the 1992 Plan is designed to "backstop" the first two vehicles of health coverage for those who do not receive benefits under the Combined Fund or IEPs. *Holland v. Double G Coal Co., Inc.,* 898 F.Supp. 351, 354 (S.D.W.Va.1995).

Courts have previously resolved the issue of whether an operator must be "in business" to remain liable for contributions to fund health benefits for miners. Only coal operators still in business are required to contribute to the combined Fund or to IEPs. In contrast, an operator still in existence, but no longer in business, remains obligated to contribute to the 1992 Plan. *See In re Olga Coal Co.,* 159 F.3d 62 (2d Cir.1998); *Holland v. American Coal Co.,* 868 F.Supp. 173 (S.D.W.Va.1994); *Double G Coal Co.,* 898 F.Supp. 351. This case goes one step beyond the prior decisions and asks whether a dissolved corporation remains liable for contributions to the 1992 Plan.

### The Effect of Corporate Dissolution

 Rule 17(b) of the Federal Rules of Civil Procedure directs that the capacity of a corporation to sue or be sued is to be determined by the law under which it was organized. It is said that this rule merely expresses general law. 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 1561 (2d ed.1990). At common law, a corporation is considered a creature of state law and can normally sue and be sued only as permitted by the law of the

state creating it. 19 Am.Jur.2d, *Corporations*, § 2170 (1986). Accordingly, the capacity of Jumacris, a West Virginia corporation, to be sued after its dissolution turns on West Virginia law.

Early West Virginia cases held that dissolution of a corporation excused further performance of unexpired or executory contracts. *See Griffith v. Blackwater Boom & Lumber Co.*, 55 W.Va. 604, 48 S.E. 442 (1904). A defunct corporation could not be sued except as specifically permitted by the statute providing for its dissolution. *Stiles v. Laurel Fork Oil & Coal Co.*, 47 W.Va. 838, 35 S.E. 986 (1900). Dissolution of West Virginia corporations is now governed by West Virginia Code § 31–1–48, which assumed its current form in 1975 and was in effect when Jumacris was dissolved. This statute provides that dissolution shall not take away any remedy against the corporation if suit is brought within two years after the corporation is dissolved. This two-year period of limitation applies to "any right or claim existing, or any liability incurred, prior to such dissolution...." It therefore supplants any other statute of limitation such as a cause of action specific statute applicable to the particular type of claim sued upon. For example, a claim for breach of contract which, under West Virginia Code § 55–2–6, would otherwise be governed by a longer limitations period would have to be asserted within two years of dissolution or be lost.

The Coal Act contains its own limitations period by reference to the Employees Retirement Income Security Act ("ERISA"). 26 U.S.C. § 9721, which provides for civil enforcement of the Coal Act, incorporates section 4301 of ERISA, 29 U.S.C. § 1451. The limitations period for suits under ERISA is found in § 1451(f)— six years after the date the cause of action arose, or three years after the plaintiff knew, or should have known, he had a

cause of action, whichever occurs last. This statute of limitations is in direct conflict with the two-year period found in West Virginia Code § 31–1–48.

■ The court has found no case under the Coal Act which resolves the conflict, but an analogous situation has arisen under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 9601, *et seq.* In several cases, federal courts have held that CERCLA preempts provisions of state law requiring suits against dissolved corporations to be commenced within certain periods of time. For example, *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130 (N.D.Fla.1994), refused to apply a provision of South Carolina law requiring suits against dissolved corporations to be brought within five years of dissolution. The logic of Judge Collier in *Chatham Steel* is compelling and follows several other cases cited in the opinion. Judge Collier observed that, since state statutes of repose serve to limit the time within which a CERCLA plaintiff can recover costs of cleaning up sites contaminated by hazardous materials, those statutes stand as an obstacle to the liability provisions of CERCLA and hinder achievement of CERCLA's goals. The state statutes are therefore preempted by CERCLA to the extent they limit recovery against dissolved corporations. Following that reasoning, this court holds that the two-year period for suits against dissolved corporations in West Virginia Code § 31–1–48 is preempted by the Coal Act, and therefore does not bar this civil action. Our inquiry, however, does not end there.

The very reason to provide by statute for dissolution of a corporation is to provide for an orderly end to its affairs and to lend certainty and finality to its business, property and obligations. This purpose would be utterly defeated if a dissolved

corporation remained amenable to suit indefinitely and corporate assets could be pursued without limit into the hands of the corporation's distributees. Accordingly, it is imperative that at some point the capacity of a dissolved corporation to be sued must end.

One method might be simply to adopt the ERISA statute of limitations, 29 U.S.C. § 1451, which 26 U.S.C. § 9721 makes applicable to actions brought under the Coal Act. This limitations period, six years after the date the cause of action arose or three years after the plaintiff knew or should have known he had a cause of action, whichever is later, would in all likelihood bar suit against Jumacris which was dissolved in 1985. This was not the approach taken by the court in *Chatham Steel*. That court did not apply the general statute of limitations applicable to claims under CERCLA. Such refusal to apply to a dissolved corporation, a statute of limitations specific to a particular cause of action is consistent with state laws. Generally, such state laws provide one period of limitations for all claims against the dissolved corporation regardless of their nature. Such an approach makes perfect sense since the objective of dissolution statutes is to provide finality to the affairs of the dissolved corporation as of a specific point in time. Therefore, instead of following the state statute of repose applicable to dissolved corporations or the federal statute of limitations contained in CERCLA, the *Chatham Steel* court adopted the federal common law rule generally applicable to claims under federal law against dissolved corporations. Relying upon *United States v. Sharon Steel Corp.*, 681 F.Supp. 1492 (D.Utah 1987), the court in *Chatham Steel* drew a distinction between dissolved corporations that are "dead" and those that are "dead and buried." The court continued:

> If a corporation has formally dissolved but not yet completed distributing its

assets, then the corporation is merely "dead." Under these circumstances, a corporate *res* remains to pay for cleanup costs and further the goals of CERCLA. Hence dissolved corporations which have not distributed their assets may be sued under CERCLA. On the other hand, if a corporation has dissolved and finished distributing its assets, then it is "dead and buried." In this situation, there is no entity to sue or defend a suit, and there are no assets to satisfy any CERCLA judgment. "Dead and buried" corporations are therefore not amenable to suit under CERCLA.

*Chatham Steel*, 858 F.Supp. at 1152 (citations omitted).

■ Jumacris fits the definition of a "dead and buried" corporation. It has been dissolved by court decree and its assets distributed. Accordingly, by analogy to CERCLA as applied in *Sharon Steel*, it is not amenable to suit under the Coal Act.

■ Plaintiffs make one further argument which should be addressed. They point out that West Virginia law requires a corporation to give notice to its creditors if it seeks dissolution; if a corporation fails to give such notice, it is not entitled to benefit of the two-year statute of limitations against any creditor not so notified. The record contains no indication that Jumacris gave any such notice concerning any obligation it had to contribute to any fund for the benefit of its coal miners. Giving such notice to the present fund, however, was impossible because that fund was not yet in existence. It would completely violate the objective of finality of corporate dissolutions for this court to hold a dissolved corporation liable for an obligation completely arising after the corporation were dissolved. Furthermore, to hold Jumacris liable here solely because it has not been established that it gave such notice would compromise the "dead and

buried" standard which federal courts apply to cut off suits against dissolved corporations.

Accordingly, the court holds that Jumacris, a completely dissolved corporation, is not liable to suit under the Coal Act. The court notes that the present case is entirely different from *In re Olga Coal Co.*, 159 F.3d 62 (2d Cir.1998), and prior decisions of this court, holding companies still in existence but no longer in business obligated to continue contributions to the 1992 Plan. Many of those companies, while no longer in the business of mining coal, retained significant assets and managed them for the benefit of the shareholders. For example, Olga itself held nearly $4 million in bank accounts and certificates of deposit, continued to file tax returns, and had two persons hired as independent contractors to keep its books. *See id.* at 63. That is not the case with a dissolved corporation. The very act of dissolution requires divestiture of any such assets and the "death and burial" of the corporation so dissolved.

Having determined that Jumacris is not amenable to .suit because it has been dissolved, the court finds it unnecessary to consider whether Jumacris was properly served with process.

## IV. CONCLUSION

It is accordingly ORDERED that this civil action is DISMISSED with prejudice as to Jumacris, and the stay, imposed by Order entered on June 5, 2000, is DISSOLVED. A new scheduling order will be entered consistent with this Opinion.

The Clerk is directed to mail copies of this Opinion and Order to counsel of record.

